560 P.2d 1244

The STATE of Arizona ex rel. Charles F. HYDER, Maricopa County Attorney, Petitioner,

v.

The SUPERIOR COURT OF Arizona, MARICOPA COUNTY, the Honorable Robert Corcoran, Judge, Respondent,

Cindy Sue Kruglick and Arthur Kruglick, Real Parties in Interest.

No. 13060.

Supreme Court of Arizona, In Banc.

March 15, 1977.

338

Charles F. Hyder, Maricopa County Atty.
by Randy Ellexson, Deputy County Atty.,
Phoenix, for petitioner.

Murray Miller, Phoenix, for real parties
in interest.

HOLOHAN, Justice.

By special action the state as petitioner challenges the action of the respon-

dent superior court judge in suppressing certain evidence seized by the state. Due to the unusual posture of the case we accepted jurisdiction.

Normally the granting of a motion to suppress is an appealable order. A.R.S. § 13-1712. Where there is an adequate remedy by appeal we will not entertain a special action. In this case, however, the state allowed the case to proceed up to the "last day" for speedy trial purposes, and there had never been a hearing or ruling on the motion to suppress by the respondents real parties in interest. The case was called for trial, a jury selected and sworn; then the court excused the jury to hear the motion to suppress. By granting the motion to suppress the superior court has virtually ended the state's case, and a directed verdict would be inevitable. The procedure followed in this case is improper. The Rules of Criminal Procedure and the public policy announced by the Legislature compel the conclusion that motions to suppress are to be ruled on before trial.

Despite the neglect of the prosecutor we feel that the issues raised must be resolved in the interest of the fair administration of justice for all parties.

The essential facts developed at the hearing were that Robert Powers, a Scottsdale police officer assigned to narcotics enforcement, worked with a confidential paid informant, Michael JoDan. The latter had developed a friendship with one Kara Koby. She confided to JoDan that Art Kruglick and Daniel Spector were narcotics dealers. She described what these individuals had done and what they were capable of doing. JoDan passed this information on to Officer Powers. It was decided that JoDan should arrange a large purchase of marijuana through Kara Koby.

JoDan had Kara Koby arrange with Arthur Kruglick for a purported Chicago buyer to purchase 500 pounds of marijuana. It was arranged for the sale to take place May 28, 1976.

On May 27, Kara Koby told JoDan that she would go to the "stash house" (9827 North 56th Street) to make sure there was enough marijuana to complete the deal. Scottsdale police officers followed Kara Koby on her visit to the "stash house" and observed her activities there.

After her visit to the "stash house" Kara Koby called JoDan to advise him that she had been to the "stash house" and that there was enough marijuana for the deal. She also said that she had talked to Art Kruglick and they could get the sample sometime that day.

Just about sunset, Kara Koby called JoDan to say that she had gotten the samples. She said Dan Spector had to go out to the "stash house" to pick up a couple of pounds and that she was supposed to bring him over to Art Kruglick's. She was then to get the sample from Art's and meet JoDan and his associates someplace else. She couldn't meet them at Art's. In her last phone call, she told them to meet her at the corner of Camelback and Miller.

JoDan and Buchanan, an undercover officer, met Koby at the appointed place. She showed them two one-pound marijuana bricks in a large grocery bag. In the course of the conversation, Koby told Buchanan that she had been at Art Kruglick's house and had seen several people there taking photographs of marijuana and "thai sticks" for a commercial calendar. After getting their samples JoDan and Buchanan dropped Koby off at a cocktail lounge.

Surveillance was set up by the police to watch both the "stash house" and the Kruglick house. Shortly after Kara Koby delivered the samples, Daniel Spector got into a pickup parked near the Kruglick residence and drove over to the "stash house." He pulled into the garage and left the garage door open. At 10:55 p.m., he left the "stash house" and drove over to another location. One officer followed and one officer remained at the "stash house." Spector returned to the "stash house" at 11:15 p.m., went in and closed the garage door. Lights in the residence went on and later those in the garage. At 11:38 p.m. he left. Both officers followed him this time. The pickup

had been empty when he returned to the "stash house" on the second occasion, but it now contained something in the bed of the pickup truck.

The two officers reported their observations to their supervisor, and they were told to stop the truck. The officers had also noted that the truck had no taillights working. A patrol car was ordered to stop the truck. While the patrol officers talked with Spector, the narcotics officers observed that there was an old frayed carpet covering what appeared to be green trash container bags. The narcotics officers arrested Spector. When they had him lean against the truck preparatory to frisking him, they smelled a faint odor of marijuana.

The supervising sergeant had been kept advised of these developments by telephone. He himself was participating in the surveillance of the Kruglick home. After consulting with Powers, he decided to secure the Kruglick home preparatory to obtaining a search warrant. He reasoned that the narcotics dealers might be operating on a "timetable." If Spector failed to return to the Kruglick house or call by a certain time, Kruglick would know that something had happened and might then attempt to destroy the evidence.

At about 15 minutes after midnight, the officers on surveillance at the Kruglick home were ordered to secure the house. After knocking and identifying themselves, they were admitted. The other rooms of the house were searched for people. In one of the rooms, an officer saw green leafy plants which he thought were marijuana. The defendants, both dressed in their nightclothes, were read their rights and confined to the front room. Nothing was taken or disturbed by the officers.

While the residence was secured one of the officers filled out an affidavit for a search warrant, and appeared before the justice of the peace who issued the warrant. After receiving the warrant, the officers searched the Kruglick premises.

The superior court "reluctantly" concluded that the evidence seized in the Spector vehicle and the Kruglick residence should be suppressed. We disagree.

Apparently the superior court felt that the stopping of the Spector vehicle was improper and that the taint carried through the case. The superior court concluded that there was probable cause to believe that the Kruglicks were in possession of marijuana from the information furnished by Kara Koby, but that there was adequate time to secure a search warrant or warrant of arrest.

■ The Spector vehicle was subject to being stopped, if for no other reason, because it was being operated at night without taillights. A.R.S. §§ 28–922; 28–1031. The subsequent examination by the narcotics officers while the patrolmen were questioning Spector was within legal limits. The narcotics officers used a flashlight to look into the truck bed. The contents of the truck were covered by a rug but parts of the covered material were visible through the cuts or holes in the carpet. If there was not probable cause to stop the vehicle before, the additional evidence produced by the visual examination of the truck's contents was certainly enough to establish probable cause for an arrest.

The Spector vehicle was also subject to being stopped because the circumstances supported probable cause to believe that it was transporting contraband. The facts necessary to support a warrantless search of a vehicle are often less than those required to justify a similar search of a residence. The nature of the vehicle as movable requires this exception. *State v. Puig,* 112 Ariz. 519, 544 P.2d 201 (1975). The exigent circumstances are inherent in the fact of the vehicle's mobility. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

■ The actions of the officers in securing the premises is challenged. The superior court judge found that the Kruglick residence was under surveillance, and that

there was no activity to suggest escape, or destruction or movement of the evidence; therefore there were no exigent circumstances which called for immediate action. The respondent judge concluded that there was time to secure a search warrant and an arrest warrant before the officer acted.

It has been held that an arrest without a warrant may be made in a public place on probable cause without exigent circumstances. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). There is still a question whether such an arrest may be valid in a private home. We do not need to decide that question, preferring to decide this case on another basis.

The state contends that the officers acted under exigent circumstances. We are referred to the testimony of the officers that swift action was necessary because they were afraid that Spector's arrest might result in action by Kruglick. They were concerned that there might be a prearranged time for Spector to call if everything was all right. Without such call the evidence might have been in danger of destruction.

The state contends that this case is governed by our decision in *State v. Stauffer,* 112 Ariz. 26, 536 P.2d 1044 (1975). In *Stauffer* the officers watched two deliveries of marijuana from a certain house, and they felt that the marijuana was being rapidly "dealt off." The officer's decision to arrest the occupants of the house without waiting for a warrant was upheld. We agree that this case and *Stauffer* are similar. We also question the finding by the respondent judge that the officers were not acting under exigent circumstances. It is always easier to second-guess the man in the field when considering the case in the quiet and safety of judicial chambers.

We believe, however, that the action of securing the premises even if not justified does not justify suppression of the evidence. The officers were not on the premises to search. They had sufficient information to justify the issuance of a search warrant.

Their actions on the premises were to stop any attempt to destroy evidence until they obtained the warrant. Under similar circumstances we have held that the subsequent seizure of evidence pursuant to a search warrant was admissible notwithstanding the fact that the officers had earlier "secured the premises." *State v. Smith,* 112 Ariz. 531, 544 P.2d 213 (1975). We believe that the same principle is applicable to the present case.

The order of the superior court granting the motion to suppress is set aside, and the superior court is directed to enter an order denying the motion to suppress. Since the trial has been suspended pending our ruling, it is ordered that the mandate of this court issue forthwith, and the superior court shall proceed in accordance with the directions and views expressed in this opinion.

GORDON, J., and OGG, J., Division One, Court of Appeals, concur.

NOTE: Chief Justice JAMES DUKE CAMERON, Vice Chief Justice FRED C. STRUCKMEYER, Jr., and Justice JACK D. H. HAYS took no part in these proceedings. Judge JACK L. OGG, Division One, Court of Appeals, was called to sit in this matter.