689 P.2d 519

**STATE of Arizona, Appellee,**

v.

**Walter Thomas BOLT, Appellant.**

**No. 6139–PR.**

Supreme Court of Arizona,
En Banc.

Sept. 26, 1984.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Tucson, for appellee.

Hirsh & Fines by Robert J. Hirsh, Michael B. Bernays, L. Anthony Fines, Tucson, for appellant.

FELDMAN, Justice.

Walter Thomas Bolt (defendant) was convicted by a jury of sale of marijuana, unlawful possession of marijuana and conspiracy. The court of appeals affirmed. *State v. Bolt*, 141 Ariz. 284, 689 P.2d 543 (App.1983). Defendant raised four issues before the court of appeals but only a single issue was raised in the petition for review filed in this court:

> Did the court of appeals err when it affirmed the trial court's refusal to suppress evidence that was seized from the defendant's house pursuant to a warrant when, absent exigent circumstances, the police had entered and "secured" the defendant's house prior to obtaining that warrant?

We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24. We granted review in order to examine and further clarify the limits under which law enforcement agencies in this state may "secure" a residence without violating fundamental rights guaranteed under the Arizona Constitution, art. 2, § 8.

The complete facts are set out in the opinion of the court of appeals. So far as relevant to the issue on which we granted review, it is sufficient to note that defendant was suspected of being a "wholesaler" of marijuana. His house was under surveillance and the officers had been reliably informed that defendant had supplied marijuana to an individual they had just arrested. The officers were in the process of preparing an affidavit in order to obtain a telephonic search warrant for defendant's home when they were called by one of the agents who had the house under surveillance and were told that defendant had just left in a pick-up truck. The officer in charge ordered one detail of officers to stop the truck and another to "secure" the house until the warrant was obtained. This was done; the defendant's truck was stopped some distance from the house while, at the same time, other officers entered and "secured" the house and its occupants. The telephonic warrant arrived

sometime after the truck had been stopped and the house "secured." Search was then made under the warrant and large quantities of marijuana were found in both truck and house.

We adverted to the problem of "securing" a residence in *State v. Martin*, 139 Ariz. 466, 679 P.2d 489 (1984). We noted there that the phrase "securing the premises" had no precise technical meaning. *Id.* at 474, 679 P.2d at 498. Defendant moved here for a stay of proceedings so that evidence could be taken under Rule 32.1(g) Ariz.R.Crim.P., 17 A.R.S., to show the details of the "normal or standard police practice" with regard to "securing" homes. We have denied that motion. The meaning of the phrase is documented by the record in this case. The supervising officer testified that his instruction to the officer on the scene "to secure the premises" meant that officers were to enter the residence without a warrant, search the home for people who might be there, advise them that a warrant would be forthcoming, and put them "together" to "wait for the agent to arrive with the warrant." According to the supervisor, "securing" the house entailed looking into each room or space in which a person might be hiding, including closets, under the bed, or wherever else someone might be found. So far as we can determine from this case and from *Martin*, the usual police "securing" practice includes holding in one room everyone found in the house, permitting them neither to leave nor to have communication with the outside. The purpose of this is to keep those in the house isolated from whatever evidence might be present and to prevent them from giving or receiving warnings. The testimony indicates that the officers disclaim any intent of looking for evidence until the warrant arrives.

Defendant argues the illegality of such entries made under the guise of "securing the premises" and urges application of the exclusionary rule to deter such activity.

Defendant argues, in other words, that the independent source rule which we recognized in *Martin* is inappropriate and that the exclusionary rule is needed to deter what defendant claims, and the record indicates, is a fairly common police practice.

■ In commencing our analysis, we note that if contraband or other evidence was seized during, or obtained as a result of, a warrantless entry of defendant's home without the excuse of exigent circumstances, the seizure would have been illegal and the evidence suppressed as the fruit of the illegal entry. *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977). However, if the contraband or evidence is seized as a result of knowledge "attributed to an independent source", it is not the "fruit of the poisonous tree," and exclusion is not required. *Id.* at 198, 564 P.2d at 887 (Struckmeyer, J., dissenting); [1] *see also Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *State v. Martin, supra.* In *Martin* we rejected the applicability of the exclusionary rule in circumstances similar to this case, but here we approach the question under the assumption, which we could not make in *Martin*, that the procedure followed is one commonly used by state officers under facts similar to those presented in the case at bench. We thus examine whether the procedure is permitted by the federal or state constitutions and, if not, whether application of an exclusionary rule is required for deterrence. We answer both questions in the negative.

## WARRANTLESS ENTRY IN THE ABSENCE OF EXIGENT CIRCUMSTANCES

Our constitutional provision reads as follows:

No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

Ariz. Const., art. 2, § 8. The Fourth Amendment to the United States Constitution proscribes unreasonable search and

---

**1.** *Cook* properly applied the exclusionary rule to facts that did not warrant invocation of the independent source doctrine.

seizure. We commented in *Martin* that unlawful entry of homes was the chief evil which the Fourth Amendment was designed to prevent. 139 Ariz. at 473, 679 P.2d at 496; *See also Welsh v. Wisconsin*, 466 U.S. ——, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). Justice Potter Stewart notes that it was the use of "general warrants," equivalent to warrantless entry at the will of the officer, which the Fourth Amendment sought to remedy. Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum.L.Rev. 1365, 1371 (1983).[2]

A recent opinion raises some question regarding the position of the United States Supreme Court on the legality of the warrantless entry. In *Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) the Supreme Court affirmed two convictions in a case very similar to the case at bench. In *Segura*, officers had made a warrantless entry in the absence of exigent circumstances. Arresting the two occupants of the apartment, the officers "secured" the apartment from "within," instead of using a perimeter stakeout. In the course of the "securing" operation, they noticed incriminating evidence in plain view. They remained at the apartment for eighteen to twenty hours until a warrant, procured by information independent of the entry, arrived. They then searched the apartment pursuant to the warrant, discovering further incriminating evidence. The trial court suppressed both the evidence which had been in plain view before the warrant arrived and that discovered upon execution of the warrant. The court of appeals reversed with respect to the evidence obtained by the search under warrant, and the Supreme Court affirmed that decision. Part IV of the majority decision, written by the Chief Justice, contains a discussion of the propriety of the warrantless entry. It argues that the

entry constituted a seizure of the "entire apartment and its contents," but that such a seizure was not unreasonable because it affected only the possessory interests of the occupants and was a reasonable means of preserving evidence and protecting it from destruction. The Chief Justice indicates that "securing of premises under these circumstances does not violate the Fourth Amendment, at least when undertaken to preserve the *status quo* while a search warrant is being sought." *Id.* at ——, 104 S.Ct. at 3388. At the same time, however, he concedes that warrantless entry to secure from within as an occasion for a warrantless search, would violate the Fourth Amendment. *Id.* at ——, 104 S.Ct. at 3389.

While four members of the court joined with the Chief Justice in parts I, II, III, V and VI, only Justice O'Connor joined in part IV. We do not conclude, therefore, that a majority of the court has yet held that warrantless entry and inspection short of search is permitted by the Fourth Amendment absent exigent circumstances, but we must certainly conclude that the Court may soon reach that view.[3] We think it appropriate, therefore, to reconsider the views expressed in *Martin* to the effect that such an entry would in and of itself violate Article 2, § 8 of the Arizona Constitution.

While we are cognizant of the need for uniformity in interpretation, we are also aware of our people's fundamental belief in the sanctity and privacy of the home and the consequent prohibition against warrantless entry. We believe that it was these considerations that caused the framers of our constitution to settle upon the specific wording in Article 2, § 8. While Arizona's constitutional provisions generally were intended to incorporate the federal protections, *Malmin v. State*, 30 Ariz. 258, 261, 246 P. 548, 549 (1926), they are specific in preserving the sanctity of

---

**2.** Cited hereafter as "Stewart, p. ——"

**3.** While only one justice joined in Part IV, none of those who concurred in the Chief Justice's

opinion limited their concurrence in any other way.

homes and in creating a right of privacy. *Id.* at 262–63, 246 P.2d at 549. After noting our previous cases and the wording of both the state and federal constitutional provisions, we held in *Martin*, 139 Ariz. at 474, 679 P.2d at 498, and affirm here, that as a matter of state law officers may not make a warrantless entry of a home in the absence of exigent circumstances or other necessity.[4] Such entries are "per se unlawful" under our state constitution. *State v. Cook*, 115 Ariz. at 194, 564 P.2d at 883. *State v. Suave*, 112 Ariz. 576, 544 P.2d 1091 (1976); *Malmin v. State*, supra; *State v. Chrisman*, 100 Wash.2d 814, 676 P.2d 419 (1984).[5] Such entries are violations of our constitution's guarantee of the right to privacy. *Martin* and *Cook* indicate that the police may "secure" premises only in the sense of allowing no one to enter. We assume, arguendo, that if the police have articulated, reasonable suspicions of illegal conduct they may stop and question those who seek to enter or leave the premises. *See State v. Graciano*, 134 Ariz. 35, 37, 653 P.2d 683, 685 (1982).

The facts here preclude any claim of necessity or exigent circumstances for a warrantless entry. The defendant was arrested some blocks from his house. The house had been under surveillance and no suspicious activity had been observed. Nothing in the record suggests that the persons remaining in defendant's home had any notion that police were in the area or that the occupants would destroy any evidence that might be on the premises. The officer in charge agreed that only by returning defendant to his home did the police raise any significant possibility that those left in the house would be alerted to the presence of police. If there was an exigency it was created by the conduct of the police. Under these circumstances, we deem the securing procedure followed here, which included the warrantless entry and protective sweep, was tantamount to a seizure of anything and anyone in the house.[6] Our constitutional provisions were intended to give our citizens a sense of security in their homes and personal possessions. It is impossible to reconcile that sense of security with the idea that the police may enter without warrant, inspect the premises, and hold everyone that they find until such time as they determine whether a warrant can be issued and brought to the home. We hold the procedure followed violates Article 2, Section 8 of the Arizona Constitution. The holding with respect to the Arizona Constitution is based upon our own constitutional provision, its specific wording, and our own cases, independent of federal authority. *See Michigan v. Long*, 463 U.S. 1032, ——, 103 S.Ct. 3469, 3474–77, 77 L.Ed.2d 1201 (1983).

## DETERRENCE

We come, then, to the question of exclusion. The United States Supreme Court has recently held that evidence obtained through search under a valid warrant obtained on the basis of information from sources independent of the prior illegal entry is not the "fruit of the poison tree" and need not be suppressed under the federal exclusionary rule as applied to the states. *Segura v. United States, supra.* There is a possibility that our interpretation of the Arizona search and seizure constitutional provision more narrowly circumscribes the right of the police to make a warrantless entry than the interpretation which the United States Supreme Court

---

4. *Cf. State v. Fisher*, 141 Ariz. 227, 686 P.2d 750 [1984].

5. The wording of Art. 1, § 7 of the Washington Constitution is identical with Art. 2, § 8 of the Arizona Constitution.

6. See and compare the following cases from the Ninth Circuit Court of Appeals: *United States v. Allard* (Allard I), 600 F.2d 1301, 1306 (9th Cir. 1979); *United States v. Allard* (Allard II), 634 F.2d 1182, 1183 (9th Cir.1980); *United States v. Lomas*, 723 F.2d 649 (9th Cir.1984); *United States v. Spetz*, 721 F.2d 1457, 1467–68 (9th Cir.1983). These decisions, which seem somewhat inconsistent on some issues, appear to agree that a warrantless entry is illegal and amounts to a seizure of the premises. Part IV of the opinion in *Segura* argues that such a warrantless entry may be a reasonable seizure of the premises.

gives to the Fourth Amendment. Therefore, we think it necessary to determine whether the evidence seized under the warrant in the case at bench need be excluded because of the prior violation of the Arizona Constitution. We turn, therefore, to consider whether a state rule of exclusion is necessary in order to deter such conduct in the future.[7]

According to Justice Stewart, before the application of the federal exclusionary rule to state courts in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), state law enforcement agencies usually ignored the Fourth Amendment while investigating criminal cases. The common practice was to dispense with the inconvenience of obtaining warrants, thus leaving the Fourth Amendment and relevant state constitutional provisions as high-sounding but empty phrases. Stewart, p. 1386; *see also People v. Cahan*, 44 Cal.2d 434, 282 P.2d 905 (1955) (review of then current problems showing disregard of the Fourth Amendment by law enforcement agencies). *People v. Cahan* was decided before *Mapp* and provides a well-reasoned rationale for an exclusionary rule to be applied by state courts as a matter of state law.

It is contended, however, that the police do not always have a choice of securing evidence by legal means and that in many cases the criminal will escape if illegally obtained evidence cannot be used against him. This contention is not properly directed at the exclusionary rule, but at the constitutional provisions themselves. It was rejected when those provisions were adopted. In such cases had the Constitution been obeyed, the criminal could in no event be convicted.

He does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him. Their very provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all people be set at naught. . . . [A]rguments against the wisdom of the constitutional provisions may not be invoked to justify a failure to enforce them while they remain the law of the land. *People v. Cahan*, 44 Cal.2d at 449–51, 282 P.2d at 914–15.

Of course, since Justice Traynor wrote these words, the United States Supreme Court decided *Mapp v. Ohio, supra,* requiring the state courts to apply a federal exclusionary rule to state court proceedings. In reaching their decision, that court seemed to find Justice Traynor's reasoning persuasive. *Id.* at 651, 81 S.Ct. at 1689. As in earlier decisions from both federal and state courts, the result in *Mapp* appears to have been reached as a matter of necessity, all other attempts at deterrence and enforcement of the constitutional provisions seemingly having failed. *See id.* at 652, 656, 81 S.Ct. at 1690, 1692.

While there is much criticism of the exclusionary rule, some of it justified,[8] Stewart argues persuasively that it has accomplished just what was intended. Law enforcement training centers and academies now routinely train officers in Fourth Amendment law and the necessity of observing the constitutional provisions. In the four years following *Mapp* the FBI alone gave over 600 courses on Fourth Amendment procedures to local law enforcement agencies around the country. Stewart, p. 1395. It is obvious, therefore,

---

7. There are other reasons justifying the existence of the exclusionary rule. When officers purposefully violate the constitution to obtain evidence to use at trial, "the success of the lawless venture depends entirely on the court's lending its aid by allowing" the use of the evidence. If the law does not permit the gathering of the evidence, the court should not "have a hand in such dirty business" by allowing its use. Further, it would be a "pernicious doctrine" to declare that the government should "commit crimes" in order to secure the conviction of criminals. *People v. Cahan*, 44 Cal.2d 434, 445–

46, 282 P.2d 905, 912 (quoting Holmes, J., and Brandeis, J., dissenting in *Olmstead v. United States,* 277 U.S. 438, 470, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928)). *See, also,* Brennan, J., dissenting in *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

8. *See* Cameron and Lustiger, The Exclusionary Rule: A Cost-Benefit Analysis, 101 F.R.D. 109, 132–42, for a review of problems created by the rule.

that the exclusionary rule is successful in promoting observance of the Fourth Amendment. However, it must also be acknowledged that there is a price paid by adoption of this method of deterrence. Evidence obtained through such searches is often the most cogent and reliable evidence of guilt or innocence, and suppression certainly allows some who are guilty to go free. *Stone v. Powell,* 428 U.S. 465, 540, 96 S.Ct. 3037, 3073–74, 49 L.Ed.2d 1067 (1976) (White, J., dissenting). We share the dismay when this results.[9] We do not share the view, however, that rights secured by the constitution are mere "technicalities" which should be swept aside in the interests of expediency even to accomplish the most desired social goal.

■ Deciding whether to adopt an exclusionary rule under the type of fact situation present in the case at bench requires us to weigh the benefits of vindicating a constitutional right through the deterrent effect of the exclusionary rule against the possibility that other deterrents may exist which would accomplish the same result at less cost to society. This, we believe, is the true form that a cost/benefit analysis should take. Because a basic constitutional right is at stake there must be some deterrent to the violation of the right. One cannot simply conclude that because crime exacts a heavy toll on society, the constitutional rights of individuals can be ignored.

Therefore, we must weigh the different forms of deterrence, not balance deterrence, itself, against no deterrence.

The best course would be to adopt a system which combines a deterrent effect with a procedure for redress of damage when rights are violated. The exclusionary rule provides only the former and imposes the cost upon society, which must bear the consequence that a guilty person may sometimes be acquitted. We believe that under the facts of this type of case, a better rule can be evolved and applied at least on an experimental basis. Justice Stewart indicates that "whether the exclusionary rule is constitutionally required turns on whether there are other adequate remedies available to insure that the government does not violate the [constitutional right] at its pleasure." Stewart, p. 1384. Chief Justice Burger concurs in this view. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 415, 91 S.Ct. 1999, 2014, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting) ("If an effective alternative remedy is available, concern for official observance of the law does not require adherence to the exclusionary rule"). Justice Cameron of this court believes in a balancing test. *See* Cameron and Lustiger, *supra,* and views espoused in the concurring opinion.

Other remedies are available but may not be practical alternatives. The English gen-

---

**9.** How often the result obtains is the subject of some controversy. Based upon a statement contained in a brief of the Solicitor General, quoting a study by the National Institute of Justice, Justice White noted that the exclusionary rule has a "major impact" on state prosecutions. According to Justice White, the NIJ studies showed that 4.8% of the 4,000+ felonies declined for prosecution were rejected because of Fourth Amendment problems. He points out, also, that prosecutors "rejected approximately 30% of all felony drug arrests" because of similar problems. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2342 n. 13, 76 L.Ed.2d 527 (1983) (White, J., concurring) (citation to NIJ study omitted). As indicated in a recent article, however, the NIJ reference in the Solicitor General's brief was "a somewhat garbled reference to an essentially irrelevant calculation." Davies, "A Hard Look at What We Know (and Still Need to Learn) about the "Costs" of the Exclusionary

Rule: The NIJ Study and Other Studies of "Lost" Arrests", 1983 American Bar Foundation Research Journal, 611, 617. The relevant figures from the NIJ study are that of all reported felony arrests in California, less than 1% are declined by prosecutors because of illegal search problems. The correct figure for prosecution rejections because of illegal search problems in felony drug arrests was 2.4%. *Id.* at 617–19. If these figures are representative of a national sample and if they are accurate, one might well conclude that the societal costs of enforcing the Fourth Amendment is not disproportionate to the benefit. This discrepancy seems to have been noted; in *United States v. Leon,* — U.S. —, — n. 6, 104 S.Ct. 3405, 3413 n. 6, 82 L.Ed.2d 677 (1984), Justice White adopts the view, however, that "the small percentages ... mask a large absolute number of felons who are released."

erally recognize no exclusionary rule; the criminal is prosecuted, illegally obtained evidence is used, and the officers who obtained it illegally are prosecuted for their violation of the law. *R v. Sang* [1979] 2 All E.R. 1222, [1979] WLR 263, 69 Cr.App.R. 282, HL; *see also* Hirschel, *What Can We Learn From the English Approach to the Problem of Illegally Seized Evidence?* 67 Judicature 425 (1984). American jurisprudence contains no established body of law which would warrant optimism that such a procedure would be viable in this country.[10] Moreover, "the harshness of [such a] sanction is also an obstacle to its effective enforcement." Stewart, p. 1386.

 Another remedy to consider is the tort action. These may be brought directly under the constitutional provision. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, supra.* Tort actions may be brought against the governmental entity under the Civil Rights Act, 42 U.S.C. § 1983, if the procedure which violated the Constitution represented official policy. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

 Expansion of tort theory has produced other remedies. There is a right of action for invasion of privacy. *Reed v. Real Detective Publ. Co.,* 63 Ariz. 294, 299, 162 P.2d 133 (1945); *see also Guin v. City of Riviera Beach,* 388 So.2d 604, 606 (Fla. App.1980); Annot., 56 A.L.R.3d 434, 440–41 (1974). This court has also recognized the tort of outrage. *Patton v. First Fed. Sav. & Loan Ass'n.,* 118 Ariz. 473, 578 P.2d 152 (1978). Other states have recognized socalled prima facie torts. *Porter v. Crawford, Co.,* 611 S.W.2d 265 (Mo.App.1980); *see generally* Annot., 16 A.L.R.3d 1191 (1967); 74 Am.Jur.2d, Torts, §§ 38 et seq.; *Restatement Second Torts,* § 870 and 874(A).

[T]he advantages of a damage action over the exclusionary rule are threefold: first, it compensates the innocent victims of a Fourth Amendment violation as well as those victims accused of criminal offenses; second, it has an element of proportionality because the amount of a judgment may be varied to reflect the egregiousness of the constitutional violation; and third, by imposing a sanction directly upon the individual violator, it produces a measure of what is frequently described as "specific deterrence."

Stewart, p. 1387. Stewart argues, however, that while such actions "serve the salutary objective of compensating all victims of Fourth Amendment violations to a degree reasonably related to the harm resulting from the infringement", such actions are "expensive, time consuming, not readily available, and rarely successful. As a result, the deterrent effect of these actions can hardly be said to be great, since the prospect of a judgment for money damages is extremely remote." Stewart, p. 1388.

 Much of this reasoning is undoubtedly correct,[11] but one other consideration is of paramount importance. While the independent source exception to the exclusionary rule approved by the Supreme Court in *Segura v. United States, supra,* is a matter of federal law, we are certainly free to adopt a state version of the exclusionary rule that differs from the federal, so long as we do not fall below the federal standards. We could, therefore, under the appropriate circumstances, refuse to recognize the independent source exception as a matter of state law, even though it was recognized as a matter of federal law. We believe, however, that one of the few things worse than a single exclusionary rule is two different exclusionary rules. *Elkins v. United States,* 364 U.S. 206, 80

---

**10.** *See Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); 18 U.S.C. § 242.

**11.** We do not imply that the fully developed facts of this case would or would not support a tort action. Previous Arizona decisional law on

the subject of "securing" was far from clear before *Martin* and this case. *See, e.g., State ex rel. Hyder v. Superior Court,* 114 Ariz. 337, 341, 560 P.2d 1244, 1248 (1977); *State v. Martin, supra,* 139 Ariz. at 474 n. 5, 679 P.2d at 498 n. 5.

S.Ct. 1437, 4 L.Ed.2d 1669 (1960) reached this conclusion in rejecting the "silver platter doctrine." It is poor judicial policy for rules governing the suppression of evidence to differ depending upon whether the defendant is arrested by federal or state officers. Therefore, even though on occasion we may not agree with the parameters of the exclusionary rule as defined by the United States Supreme Court, we propose, so long as possible, to keep the Arizona exclusionary rule uniform with the federal. We therefore do not propose to make a separate exclusionary rule analysis as a matter of state law in each search and seizure case. Should the Supreme Court abolish the exclusionary rule, we might be tempted to follow their lead with respect to Arizona law, especially if in the meantime the legislature should have provided us with some other, suitable deterrent against police non-observance of the constitutional requirements.

We therefore hold, for the present, that the exclusionary rule to be applied as a matter of state law is no broader than the federal rule. The independent source doctrine may be applied under the Arizona constitutional provision, and exclusion of evidence obtained under a legal warrant need not be required because of the prior state constitutional violation. We do not reach the question of the viability of an exclusionary rule under the Arizona constitution, should that rule be abandoned by the United States Supreme Court. Nor, if such a rule is to be recognized or retained as a matter of state law, do we decide what limits or standards should exist for its application.

Therefore, the opinion of the court of appeals is approved as modified by this opinion, and the judgment of conviction is affirmed.

HOLOHAN, C.J., and GORDON, V.C.J., concur.

CAMERON, Justice, specially concurring.

As defined by the United States Supreme Court, the exclusionary rule has been much criticized, depending in good part on the philosophy of the speaker.[1] In praising or criticizing the rule, individual cases are usually cited to support the conclusion of the speaker. Those in support cite the facts in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), as a reason for the application of the exclusionary rule. Any fair reading of *Mapp v. Ohio*, supra, must evoke some support for the exclusionary rule, and there can be no sense of outrage at the result reached by the United States Supreme Court in that case. This does not mean that a strict or remorseless application of the exclusionary rule will cure the evils of the outrageous police conduct apparent in the case of *Mapp v. Ohio*, supra. For example, a major study which has been widely quoted was conducted by Dallin H. Oaks, then a Professor at the University of Chicago Law School, and a former Justice of the Utah Supreme Court. D. Oaks, Studying the Exclusionary Rule in Search and Seizure,

1. Cardozo, J., in *People v. Defore*, 242 N.Y. 13, 150 N.E. 585 (1926); J. Wigmore in 8 J. Wigmore, Evidence, Sec. 2184 (3d ed. 1940); Frankfurter, J., for the Court in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); Burger, J., in Who Will Watch the Watchman?, 14 Am.U.L.Rev. 1 (1964); La Fave and Remington in Controlling the Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions, 62 Mich.L.Rev. 987 (1965); D. Oaks in Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665 (1970); Burger, C.J., dissenting in *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.*, 403 U.S. 388, 411, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619, 635 (1971); C.A. Wright in Must the Criminal Go Free if the Constable Blunders?, 50 Tex.L. Rev. 736 (1972); J. Kaplan in The Limits of the Exclusionary Rule, 26 Stan.L.Rev. 1027 (1974); E. Griswold in Search and Seizure: A Dilemma of the Supreme Court (1975); Powell, J., for the Court in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); Wilkey, J., in The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 215 (1978); Rehnquist, J., in *California v. Minjares*, 443 U.S. 916, 100 S.Ct. 9, 61 L.Ed.2d 892 (1979); G. Bell in Attorney General's Task Force on Violent Crime—Final Report, p. 55 (1981); President's Task Force on Victims of Crime, Final Report, December, 1982, p. 25 et seq.

37 U. of Chi.L.Rev. 665 (1970). His study of the effects of the rule on police behavior in a number of locations found "no convincing evidence to verify the functional premise of deterrence upon which the rule is based," Oaks, supra, at 672, and he argued, "As a device for directly deterring illegal searches and seizures by the police, the exclusionary rule is a failure." Oaks, supra, at 755. On the other side, the cost of the rule becomes apparent at the suppression of perfectly valid, good, and material evidence, with the result that the perpetrators of horrible and heinous crimes go free. Also, I believe one of the main defects of the rule is that by the very action of focusing upon the rule rather than the evidence, guilt becomes immaterial. The diversion of the fact-finding process from the search for the truth may be the major cost of the exclusionary rule. As Dallin Oaks has stated:

> Truth and justice are ultimate values, so understood by our people, and the law and the legal profession will not be worthy of public respect and loyalty if we allow our attention to be diverted from these goals.

Ethics, Morality and Professional Responsibility, 1975 B.Y.U.L.Rev. 591, 596 quoted by the United States Supreme Court in *Stone v. Powell*, 428 U.S. 465, 491, n. 30, 96 S.Ct. 3037, 3051, n. 30, 49 L.Ed.2d 1067, 1086, n. 30 (1976). Charles Alan Wright has noted with reference to the exclusionary rule:

> Its benefit to society is dubious and uncertain. Its cost to society is great and real. Hundreds or thousands of criminals go free each year because the police are found to have violated, in one way or another, the intricate body of law on when and how they may search.

C.A. Wright, Must the Criminal Go Free If the Constable Blunders, 50 Tex.L.Rev. 736, 741 (1972).

This does not mean that there is not some benefit in the exclusionary rule. However, the societal costs of invoking the rule vary greatly from case to case, and I believe the rule can be and should be restricted to those cases where these societal costs of imposing the rule do not exceed the benefits of the enforcement of the rule.

Insofar as allowed by the United States Supreme Court in their future decisions, I would adopt a balancing test for the admission of illegally obtained evidence under the Arizona Constitution.[2] This balancing approach would prevent the rule from being invoked whenever the societal costs of applying the rule exceed societal benefits. In its simplified form, it would directly compare the gravity of the crime in a particular case with the gravity of the police misconduct, in order to determine whether the costs of freeing the guilty exceed the expected benefit of deterring the police. Where such societal costs exceed the expected benefits, it is socially unwise to apply the exclusionary rule, so the rule should not be applied.

Where the expected benefits outweigh such costs, it can reasonably be argued that the rule is justified and should continue to be used. The internal logic of this test is simple—where the criminal conduct involved is more dangerous to society than the police misconduct, it does not make sense to sacrifice the criminal prosecution in order to deter the police.

Balancing costs and benefits is not new in the law. The balancing of costs and benefits is the essence of intelligent human decisionmaking, and this has been broadly recognized by the law. For example, it forms the basis of the familiar "Hand formula," *United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir.1947), a balancing which is at the core of the law of negligence. This tort doctrine holds that if a person fails to correctly balance the costs and benefits of taking a particular precaution, he will have to pay for the consequential harm. If judges expect members of the public to balance costs and benefits in making their decisions, why should mem-

---

**2.** Much if not most of what I say here has been previously stated in Cameron and Lustiger, The Exclusionary Rule: A Cost-Benefit Analysis, 101 F.R.D. 109 (1984).

bers of the public not expect the same from judges?

And judges do just that. A careful weighing of societal interests is involved every time a decision is made defining such broad concepts as "due process of law," "freedom of the press," "establishment of religion," and "cruel and unusual punishment." Enforcement of the Fourth Amendment protection against "unreasonable searches and seizures" should not be treated any differently.

Perhaps the area of "freedom of speech" provides the best illustration of the weighing and balancing undertaken by the Supreme Court in implementing constitutional provisions. Justice Frankfurter, one of the Court's most articulate advocates of judicial balancing, said in his concurrence in *Dennis v. United States*, 341 U.S. 494, 521, 524–25, 71 S.Ct. 857, 873, 874–75, 95 L.Ed. 1137, 1158–59, 1160 (1951):

> The historic antecedents of the First Amendment preclude the notion that its purpose was to give unqualified immunity to every expression * * *.
>
> * * * * * *
>
> Absolute rules would eventually lead to absolute exceptions, and such exceptions would eventually corrode the rules. The demands of free speech in a democratic society as well as the interest in national security are better served by a *candid and informed weighing of the competing interests*, within the confines of the judicial process, than by announcing dogmas too inflexible for the non-Euclidean problems to be solved. (emphasis added)

Constitutional absolutism in the area of search and seizure has not worked. The United States Supreme Court has made clear, however, that "the policies behind the exclusionary rule are not absolute. Rather, they must be evaluated in light of competing interests." *Stone v. Powell*, supra, 428 U.S. at 488, 96 S.Ct. at 3049, 49 L.Ed.2d at 1084. The Court has spoken of the "balancing process" at work in the cases creating exceptions to the exclusionary rule, defining this process as "weighing the utility of the exclusionary rule against the costs of extending it" in a particular context. *Id.* at 489, 96 S.Ct. at 3050, 49 L.Ed.2d at 1085.

A form of a balancing approach has been suggested by other writers. Professor Kaplan has proposed a "serious case" exception which he describes as follows:

> The * * * proposed modification of the exclusionary rule is a simple one. It would provide that the rule not apply in the most serious cases—treason, espionage, murder, armed robbery, and kidnapping by organized groups * * * [;] * * * the mere fact of a fourth amendment violation would not require the exclusion of evidence in the relatively small class of the most serious cases.

J. Kaplan, The Limits of the Exclusionary Rule, 26 Stan.L.Rev. 1027, 1046 (1974). Parenthetically, it is submitted such crimes as rape and arson should be added to this list of "serious cases." I agree with this exception, although I do not believe it goes far enough. It is in this group of cases that the costs of applying the exclusionary rule are the highest, and the potential disproportion between the gravity of the crime and the gravity of the police impropriety is the greatest. Regardless of the actual amount of this disproportion, the gravity of these cases always will by definition exceed the gravity of any Fourth Amendment violation. This is because, the rhetoric of some civil libertarians to the contrary, it *is* worse to be murdered or raped than to have one's house searched without a warrant, no matter how aggravated the latter violation. The only problem with this exception is that it is incomplete, and Kaplan's formulation only looks at one side of the equation—costs. Only where the costs of the rule are very high, would Kaplan not apply it.

On the other end of the scale is the "good faith" exception, which also looks at only the other side of the equation—benefits. This exception would restrict use of the rule whenever the police officer has acted in good faith, and so the benefits of deterring him would be very low. One of the most ardent advocates of this exception

is Justice Byron R. White who explains its function as follows:

When law enforcement personnel have acted mistakenly, but in good faith and on reasonable grounds, and yet the evidence they have seized is later excluded, the exclusion can have no deterrent effect. The officers, if they do their duty, will act in similar fashion in similar circumstances in the future * * *.

*Stone v. Powell,* supra, at 540, 96 S.Ct. at 3073, 49 L.Ed.2d at 1114 (White, J., dissenting). This is also the thrust of the argument made by Judge Henry Friendly who would exclude only "the fruit of activity intentionally or flagrantly illegal." Benchmarks, 260–62 (1967), quoted in *United States v. Williams,* 622 F.2d 830, 841 (5th Cir.1980). Similarly, Charles Alan Wright would apply the rule only to "outrageous" police conduct. Wright, supra, at 744. This simple good faith/bad faith test thus would not apply the rule where it appears that the deterrent benefit is small or nonexistent, and would apply the rule where the potential deterrent benefit appears large. Adoption of a good faith exception has also been recommended by the American Law Institute, Model Code of Pre-Arraignment Procedure, Sec. SS 290.2 (Off. Draft No. 1, 1972), and by a recent Attorney General's Task Force Report, Attorney General's Task Force Report—Final Report at 55–56 (1981), and has been adopted by the Fifth Circuit in *United States v. Williams,* supra. As noted in the majority opinion, the Supreme Court recently approved a good faith exception to the exclusionary rule in a case where the police relied upon a valid search warrant to obtain evidence. *Segura v. United States,* — U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

I also agree with the results of this test. Where the deterrent benefit to police would be very small or non-existent, it should be outweighed by the cost of releasing essentially any criminal. The shortcoming of this rule, however, is that it is underinclusive, leaving out many of the most important cases. These include all cases in which the police acted with less than good faith, but their actions are outweighed by the egregious nature of the crime. This overlooks the fact that flagrantly illegal searches also take place against very serious criminals such as murderers, kidnappers, rapists, and foreign spies.

The major strength of the balancing approach is that by definition it avoids disproportional results, likely the greatest drawback of the exclusionary rule. This approach leads to socially sensible decisions. The exclusionary rule is applied only when the benefits of its application outweigh its costs.

Aside from this strong utilitarian argument, the balancing approach is also justified in terms of the fundamental fairness of its results. The accused will be allowed to invoke the rule only where the illegality committed against him is more grave than the crime he has committed against others. Thus, the accused will be "let off" only where he has suffered more than his purported victims.

Another major advantage of the balancing approach is that it could serve to replace all of the piecemeal exceptions to the rule heretofore created by the Court when faced with compelling cases. This would return some rationality to this area of the law. Not only would there be more common sense, but also more stability. In the future, the opportunity to openly balance the equities of these cases would remove the pressure on the Court to create new exceptions of questionable merit to reach right results.

Admittedly, the price of this return to rationality would be that it may require a substantial expenditure of the time and effort of judges, who must perform the delicate balancing of social interests called for by this proposal. It is doubtful, however, that the court would spend as much time as it does now in hearing motions to suppress. This is because the relevant inquiry would be based on the general equities presented by the facts, rather than on minute technical distinctions. Per se categories could resolve the easy cases, as is done in other areas of the law. One such category could be established for types of crime deemed so

serious that no search and seizure violation would ever justify application of the exclusionary rule; another per se category would be established for crimes so trivial that deterrence of any search and seizure violation would justify applying the rule. The "hard cases" in the middle would still require a careful weighing and balancing of competing interests to reach the right result in each case. But is this not what the judicial process is really all about?

It is submitted that the strengths of this plan are greater than the weaknesses, and the expenditure of judicial resources required is justified in terms of the benefits of better results and better law. Even so, the expenditure of judicial time need not be more than the time now spent in the suppression hearing. This balancing approach should be adopted, then, if the exclusionary rule is destined to survive at all.[3]

HAYS, Justice, concurring.

I concur with Justice Cameron.

---

**3.** In concurring I assume, however, that there is no Wong Sun problem, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). If there were a violation of Wong Sun, *id.,* a balancing approach would suggest that such "tainted" evidence be excluded because the police transgressions are both serious and systematic, and the crime as indicated by the sentence imposed (concurrent three year terms of probation) is neither serious nor violent.