931 P.2d 1143

**Michael RICARD, Plaintiff–Appellee,**

v.

**ARIZONA DEPARTMENT OF TRANSPORTATION, Defendant–Appellant.**

**No. 1 CA–CV 96–0173.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 30, 1997.

Cameron A. Morgan, Scottsdale, for Plaintiff–Appellee.

Grant Woods, Attorney General by Peter C. Gulatto, Assistant Attorney General, Phoenix, for Defendant–Appellant.

## OPINION

PATTERSON, Judge.

The Arizona Department of Transportation appeals from the superior court's reversal of the suspension of Michael Ricard's license to drive. The superior court ruled that the record clearly revealed that (1) the officer had not informed Ricard that his conduct in "attempting to obfuscate the testing process" would be deemed a refusal to take the test; and (2) that Ricard "recanted" his refusal.

We affirm, but on different grounds. Before the issue of recantation of a refusal becomes pertinent, there must be an effective refusal. The evidence produced in the hearing was insufficient to support the hear-

ing officer's determination of a refusal. We therefore address the factors that determine whether a driver has refused to take the implied consent test.

## FACTS AND PROCEDURAL HISTORY

Michael Ricard's car struck another vehicle, causing minor damage. Scottsdale police officer Todd Larson[1] arrived at the scene of the accident at 12:43 a.m., where he encountered Ricard and two women. Larson learned that Ricard's car had rear-ended the women's pickup. He then gave Ricard an insurance information card to exchange with the other driver. According to Larson, Ricard threw the card back in Larson's face, saying they had already exchanged information. Larson detected an odor of alcohol on Ricard's breath and noted his watery eyes. Ricard admitted having had a few drinks. Larson asked Ricard to submit to field coordination tests, which Ricard refused.

Larson placed Ricard under arrest for driving under the influence of alcohol and asked him to submit to a blood test. Ricard agreed. Larson then transported Ricard to the hospital where, after some delay waiting for hospital security to arrive, they proceeded to the room where blood was to be drawn. Ricard then asked to use the phone to call an attorney. After Ricard used the phone, he was asked to sign a hospital consent form that included language releasing the hospital from civil liability. Upon reading the form, Ricard declined to sign. Larson then informed Ricard that refusing to sign the form constituted a refusal of the test, and transported Ricard to the police station.

At the station, Larson "redesignated the test" and offered Ricard the opportunity to take a breath test. Ricard agreed. Officer James Butera was to administer the test using an Intoxilyzer 5000. Butera advised Ricard that he planned to perform a duplicate testing procedure. He informed Ricard there would be a deprivation period[2] of 15 minutes. Butera "told him not to bring anything into his mouth, cough, belch, or vom-

---

1. Larson's name at the time was Anderson; he subsequently had it legally changed.

2. In his testimony, Butera was unable to distinguish clearly between an "observation" period and a "deprivation" period, and used these terms interchangeably.

it. . . ." After the period began, Ricard "started smacking his lips like he was bringing saliva up into his mouth." Shortly thereafter, Ricard asked to speak to an attorney. Butera left the room to see if a phone was available and was informed that Ricard had already spoken to an attorney. He then returned to the room and told Ricard he would not permit another call to an attorney. Butera began a second 15–minute deprivation period, repeating the instructions about not bringing anything into his mouth, coughing, belching or vomiting. Despite Butera's repeated instructions, Ricard continued to smack his lips. Butera continued with the deprivation period.

Near the end of the deprivation period, Butera advised Ricard there was a minute left before the test would take place. According to Butera, "[Ricard] sat back in his chair, took a brief, deep breath, swallowed hard and belched extremely loudly." Butera informed Ricard that he was causing unnecessary delay by not following instructions. He then told Larson he was treating Ricard's lack of cooperation as a refusal to take the test, whereupon Ricard was taken to a cell. Ricard stated that he wished to take the test, but Butera would not attempt the test again. Ricard shouted from the cell that he wanted to take the test, but was informed that his license would be suspended for refusing to take the test.

At Ricard's administrative hearing, Chester Flaxmayer[3] gave expert testimony regarding alcohol breath testing. First, he stated that there is a difference between "observation" and "deprivation" periods, particularly with regard to the duplicate testing Butera planned to perform. In pertinent part, Flaxmayer testified that an observation period requires restricting a subject from regurgitation, including belching, and that a deprivation period would not necessitate such a restriction. Regarding Ricard's conduct, he stated that "smacking" the lips or bringing up one's own saliva would not affect the test. He further testified that a belch of stomach gas would not affect the test, and

that a "wet" belch would not necessarily have an adverse effect on the test; nor would the fact that Butera left the observation room for a short period. Finally, he stated that the Intoxilyzer 5000 was designed to detect and warn of the presence of mouth alcohol and that, even if it missed that detection, the results would not be adversely affected because of the repetitive procedure used in duplicate testing.

The ALJ concluded that Ricard had, by his conduct, refused to take the breath test and had not recanted that refusal. The ALJ therefore upheld the suspension of Ricard's license to drive. Ricard appealed to the superior court, which reversed the suspension because Ricard was not advised that "a failure to effectively cooperate in the administration of the test would be deemed to be a refusal, and if such conduct persisted, [his] license would be suspended"; and that Ricard had effectively recanted the refusal and should have been allowed to take the test. The court entered judgment reversing the license suspension and the state timely appealed. We have jurisdiction pursuant to Ariz.Rev.Stat. Ann. ("A.R.S.") sections 12–2101(B) (1994) and 12–913 (1992).

## DISCUSSION

■ On appeal from an administrative decision under the implied consent law, the superior and appellate courts must uphold the administrative agency's decision unless it is not supported by competent evidence. *Sherrill v. Department of Transp.*, 165 Ariz. 495, 497, 799 P.2d 836, 838 (1990); *Smith v. Department of Transp.*, 146 Ariz. 430, 432, 706 P.2d 756, 758 (App.1985). In an implied consent hearing, the state has the burden of proving by a preponderance of the evidence that: (1) the law enforcement officer had reasonable grounds to believe the person had been driving or was in actual physical control of a motor vehicle within Arizona while under the influence of intoxicating liquor; (2) the person was placed under arrest; (3) the person refused to submit to the implied consent test; and (4) the person was informed of the

---

3. The hearing officer stipulated to Flaxmayer's credentials as an expert on breath testing. Flaxmayer has previously testified as an expert for

the state. *See State v. White*, 155 Ariz. 452, 455, 747 P.2d 613, 616 (App.1987); *State v. Velasco*, 165 Ariz. 480, 485, 799 P.2d 821, 826 (1990).

consequences of refusal. A.R.S. § 28–691(G)(Supp.1996); *Sherrill,* 165 Ariz. at 498, 799 P.2d at 839.

While it is the third element—refusal of the test—that is at issue here, we must frame that issue with greater precision. Ricard verbally assented to the breath test, but was not permitted to take the test because he did not obey Officer Butera's instructions. Butera instructed Ricard, *inter alia,* not to belch or bring saliva into his mouth by smacking his lips during the period just prior to the test. Ricard performed these actions despite Butera's instructions. Upon hearing Ricard belch, Butera determined that Ricard's behavior constituted wilful noncooperation with the test and deemed it a refusal. The problem as discussed below, however, is that the Arizona Department of Health Services' ("D.H.S.") regulation governing the test does not prohibit such behavior. Nor would such behavior affect the administration or result of the test.

▮ We are therefore presented with the question of whether a test operator has the discretionary authority to impose restrictions upon a test subject's behavior and then determine that a refusal has occurred when those restrictions are violated, even though such behavior is not restricted by regulation and would not affect the administration or result of the test. We begin our discussion with a brief review of the Arizona implied consent law.

▮ A motorist arrested within Arizona for driving under the influence is deemed to have given "consent" to a test to determine blood alcohol content. A.R.S. § 28–691(A) (Supp.1996); *Sherrill,* 165 Ariz. at 497, 799 P.2d at 838. If the motorist refuses the test, the motorist's license to drive is suspended or denied for twelve months. A.R.S. § 28–691(B), (D) (Supp.1996). An arrested motorist is deemed to have refused the test if he or she fails to expressly agree to, or successfully complete the test. A.R.S. § 28–691(B) (Supp.1996). A driver may negate a verbal consent through his or her nonverbal wilful noncooperation. *Sherrill,* 165 Ariz. at 499, 799 P.2d at 840 (citation omitted). Indeed, this court on several occasions has upheld the finding of a refusal where the arrested motorist's conduct evidences noncooperation with the test. *E.g., Ontiveros v. Department of Transp.,* 151 Ariz. 542, 542, 729 P.2d 346, 346 (App.1986) (the motorist acted like he was blowing into the machine and deposited gum on the mouthpiece); *Kuznicki v. Department of Transp.,* 152 Ariz. 381, 381, 732 P.2d 1119, 1119 (App.1986) (the motorist attempted the test several times and blew from the side of his mouth despite being told not to do so).

▮ Thus, refusal is established when an arrested motorist verbally agrees to take the test, but negates that acceptance by his or her conduct. *Sherrill,* 165 Ariz. at 499, 799 P.2d at 840 (citation omitted). Nonetheless, a finding of refusal cannot be supported solely by the test administrator's conclusion that the driver did not complete the test. *Burson v. Collier,* 226 Ga. 427, 175 S.E.2d 660 (1970); *cited with approval in Sherrill,* 165 Ariz. at 501, 799 P.2d at 842.[4] We therefore examine the evidence to determine whether it supports a reasonable conclusion that Ricard's conduct constituted wilful noncooperation with the test. We hold that it did not.

We agree with the state that there is evidence to support an inference that Ricard may have engaged in some gamesmanship to delay the test. For example, he agreed to a blood test—indeed, expressly requested a blood test—then refused to sign the hospital's waiver form, despite being an attorney experienced in DUI matters and acquainted with police procedures.[5] Nonetheless, there

---

**4.** "Since the statute does not set out what constitutes a complete test, we do not think it a salutory [sic] practice to let the Intoximeter operator have an unfettered right to determine what is or is not a complete test." *Burson,* 226 Ga. at 429, 175 S.E.2d at 662, *quoted in Sherrill,* 165 Ariz. at 501, 799 P.2d at 842.

**5.** Related to this fact situation, Ricard argues that he was denied equal protection because the hearing officer based his decision on the fact that Ricard is an attorney. This argument is without merit. The hearing officer referred to Ricard's occupation merely as evidence in support of his conclusion that Ricard was knowledgeable about the procedures and therefore knew where games-

is a preference in Arizona for administering the test, *Noland v. Department of Transp.*, 151 Ariz. 466, 469, 728 P.2d 685, 688 (App. 1986), and Ricard's actions were not an impediment to doing so.

The hearing officer in this case found that Ricard's conduct fell below the standard of cooperation contemplated in the implied consent statute and that Ricard refused to submit to the test. These findings were based upon Ricard's uncooperative behavior prior to arrest, his refusal to sign the hospital waiver, and Officer Butera's determination of refusal due to Ricard's conduct prior to the breath test. It is this last factor that is at the heart of this case because the breath test was the "designated" test at the time Ricard was deemed a refusal. We therefore do not address the question of whether Ricard's uncooperative behavior prior to arrest[6] or his refusal to sign the hospital waiver form[7] were proper factors to consider in determining refusal of the test.

According to Butera, the following actions caused him to consider Ricard as having refused the breath test: he asked to speak to an attorney, though he had already spoken with one; he "smacked" his lips, producing saliva in his mouth; and finally, he intentionally and loudly belched just before the test was to take place. Notwithstanding Ricard's various activities, Butera did not consider Ricard a refusal until he belched. Yet the evidence adduced at the hearing from expert testimony and D.H.S. regulations was that neither the belch nor Ricard's other actions would have affected the administration or result of the test Butera planned to perform.

Butera's erroneous assessment begins with his failure to distinguish between observation and deprivation periods, a distinction admittedly subtle. A deprivation period is used before duplicate testing[8] while an observation period is used before nonduplicate testing. *See* A.A.C., Title 9, Ch. 14, Exhibits O and OO ("Operator Checklists" for the "Standard Operational Procedure" for the Intoxilyzer Model 5000 for duplicate and non-duplicate tests).

A deprivation period is "a 15–minute period immediately prior to a quantitative duplicate breath test during which period the subject has not ingested any alcoholic beverages or other fluids, vomited, eaten, smoked or placed any foreign object in the mouth." A.A.C. R9–14–401(8). This regulation includes no restriction on belching. An observation period, on the other hand, is a 20–minute period where an operator of a breath-testing device observes the individual to ensure there is no eating, no drinking, no foreign objects in the mouth, no smoking, no regurgitation and no vomiting. *See* A.A.C., Title 9, Ch. 14, Exhibits N and O. According to Flaxmayer, regurgitation could include a belch. Regurgitation must be restricted during an observation period but need not be restricted during a deprivation period. Neither regulation prohibits forming saliva in the mouth.

Flaxmayer testified that the results of the duplicate testing Butera planned to perform would not be affected by smacking the lips (i.e., bringing saliva into the mouth) or belching. This is consistent with the D.H.S. regulation on duplicate testing noted above. Furthermore, under the relatively new procedures for duplicate testing on the Intoxilyzer 5000, the operator need only run duplicate tests that agree in their results to within .020. If the results do not agree

---

manship could work. There is no support for Ricard's contention that the hearing officer improperly held his occupation against him.

6. We note, however, that the provisions of the implied consent statute become operable only *after* a person is arrested. *State v. Waicelunas*, 138 Ariz. 16, 19, 672 P.2d 968, 971 (App.1983); A.R.S. § 28–691(A) (Supp.1996).

7. We are not aware of Arizona cases addressing whether a refusal to sign a release of civil liability constitutes a refusal of the test itself. However, courts of other jurisdictions have held that,

while an arrested motorist must give unqualified assent to the test, he or she is not required to execute a document limiting or waiving the tester's liability. *E.g., Maffei v. Department of Transp.*, 53 Pa.Cmwlth. 182, 416 A.2d 1167, 1169 (1980); *Transportation Cabinet v. Driver*, 828 S.W.2d 666, 667 (Ky.Ct.App.1992).

8. " 'Duplicate test' means two consecutive breath tests conducted after a deprivation period." Arizona Administrative Code ("A.A.C.") R9–14–401(11).

within that range, the operator is to continue running tests until he obtains two consecutive results within .020. This too is consistent with D.H.S. regulations:

> Duplicate quantitative breath tests shall be administered at intervals of not less than 5 minutes nor more than 10 minutes. The results of both tests shall be within .020 alcohol concentration of each other. If the 2nd test is not within .020 alcohol concentration of the 1st test, additional tests shall be administered until the results of 2 consecutive tests are within .020 alcohol concentration.

A.A.C. R9–14–404(C).

Nonetheless, Butera testified that according to his training, it mattered that the subject belched during the deprivation period.[9] However, this testimony is not consistent with D.H.S. regulations on duplicate testing. Butera further testified that a "wet belch, a vomitous type belch, would affect the breath test." Again, this testimony is inconsistent with D.H.S. regulations governing duplicate testing.

While Ricard did smack his lips despite being instructed otherwise and did ask to call his attorney a second time, Butera did not consider him a refusal when these actions occurred. Butera even restarted the deprivation period after leaving the room for a short time although, according to Flaxmayer, a restart was not necessary. It was not until Ricard belched that Butera considered it a refusal. However, as the competent evidence adduced at the hearing revealed, neither the belch nor Ricard's other actions would have affected the validity of the test. Ricard disobeyed Butera's direct instructions, but these instructions were neither consistent with nor required by D.H.S. regulations. In effect, Butera employed his own standards in administering the test.

■ *Sherrill* suggests, and we agree for the purposes of this case, that it cannot be left to the officer's unfettered discretion what will, and what will not, be considered a refusal. As Ricard argues, a reasonable officer could not base a refusal on the fact that the subject blinked his eyes or wiggled his toes, even if the officer had directly instructed the subject not to do so. Those actions would not affect either the validity of the test or the officer's ability to administer the test.

So it is with the factors Butera relied on here. The actions that precipitated Butera's judgment that Ricard was refusing the test do not constitute a proper basis for such a determination. The record demonstrates that neither saliva in the mouth nor a belch (like eye-blinking or toe-wiggling) would have adversely affected the test. It was therefore not reasonable for Butera to determine that Ricard had, by this conduct, refused to take the test. Officer Butera erred in determining Ricard to be a refusal on this basis, and the hearing officer erred in upholding the license suspension.[10]

---

9. The hearing officer explored with Flaxmayer Butera's apparent unfamiliarity with the new duplicate testing procedure:

> ALJ: Mr. Flaxmayer. The deprivation period is apparently new [sic] phenomenon vis-a-vis be [sic] the observation period. Is that not correct?
> WITNESS: It's new in Arizona.... Yeah. Yes.
> ALJ: And your testimony is—there are no lesson manuals about what a deprivation period is describing?
> WITNESS: I don't know. I haven't seen any that specifically differentiate between observation and deprivation. All the training materials that I have seen that people are still using, are the older manuals that talk about observation and that all they're doing in class, not having added anything to the manual, is going ahead and describing the definition that is in the Department of Health Services Regulation.

But there's no addition to the training manuals that I have seen.
> ALJ: In the observation period training.
> WITNESS: Yes.
> ALJ: That was more encompassing, was it not, to involve any wet belch, to involve—
> WITNESS: Yes.
> ALJ: things that are not included in the deprivation period.
> WITNESS: Right.
> ALJ: pursuant to the DHS Reg.
> WITNESS: Correct.
> ALJ: It would not be unreasonable or unusual for an officer to have been trained in the observation period to really think that there's really no distinction between the two in terms of what they're looking for—an old school officer.
> WITNESS: Sure. Sure.

10. Because of this holding we need not reach the other issues argued in the parties' briefs.

We do not intend our decision today to provide new opportunities to drunk drivers who wish to avoid the implied consent laws by stretching the limits of creativity in the use of gamesmanship. We simply hold that a test operator must administer the implied consent test properly. The operator may not impose arbitrary restrictions upon an arrested motorist's behavior during the testing process if that behavior has no discernible effect on the administration or result of the test, and then use a violation of those restrictions as the basis for determining that the motorist has refused the test.

## CONCLUSION

The state has failed to meet its burden of showing refusal by conduct in this case because the police officer administering the breath test based his determination of refusal upon impermissible criteria not supported by relevant D.H.S. regulations. We therefore affirm the decision of the superior court reversing the decision of the Administrative Law Judge.

LANKFORD and WEISBERG, JJ., concur.