IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| WENDY LYN TORNABENE, | ) | 2 CA-CV 2001-0124 |
| | ) | DEPARTMENT B |
| Plaintiff/Appellee, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | |
| LARRY BONINE, ex rel. ARIZONA | ) | |
| HIGHWAY DEPARTMENT, and MOTOR | ) | |
| VEHICLE DIVISION aka ARIZONA | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendants/Appellants. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20005504

Honorable Michael J. Brown, Judge

REVERSED

Janet Napolitano, Arizona Attorney General
  By Richard L. Rice and Peter C. Gulatto                                        Phoenix
                                                  Attorneys for Defendants/Appellants

Stephen Paul Barnard                                                             Tucson
                                                  Attorney for Plaintiff/Appellee

P E L A N D E R, Judge.

¶1        The Arizona Department of Transportation, Motor Vehicle Division (MVD),

appeals from a Pima County Superior Court order vacating the suspension of appellee Wendy Lyn

Tornabene's driver's license by a MVD administrative law judge (ALJ). This case presents an issue of first impression in Arizona: does the alleged unconstitutionality of a law enforcement officer's stop of a vehicle invalidate the state's subsequent suspension of the motorist's driver's license, pursuant to A.R.S. § 28-1321, based on the motorist's refusal to submit to a breath test after having been arrested for driving under the influence of alcohol (DUI)?[1] The ALJ implicitly answered that question in the negative. On review, however, the superior court ruled otherwise, concluding that MVD may not suspend a DUI arrestee's driver's license if the underlying stop was illegal. Because we disagree with that conclusion, we reverse the superior court's order and reinstate the ALJ's license suspension order.

## BACKGROUND

¶2     We view the evidence in the MVD administrative record in the light most favorable to sustaining the ALJ's decision, which "may be set aside only if it is unsupported by competent evidence." *Ontiveros v. Arizona Dep't of Transp.*, 151 Ariz. 542, 543, 729 P.2d 346, 347 (App. 1986). *See also Owen v. Creedon*, 170 Ariz. 511, 512, 826 P.2d 808, 809 (App. 1992). On the evening of September 4, 2000, Tucson Airport Authority Police (TAAP) received a telephone tip

_____

[1]In *Pinedo v. Arizona Department of Transportation*, 200 Ariz. 95, 23 P.3d 90 (App. 2000), this court addressed a virtually identical issue under A.R.S. § 28-1385(I), which applies when testing of a motorist's blood alcohol concentration produces a result that exceeds the legal limit for driving. We concluded in *Pinedo* that both the ALJ and superior court had exceeded the limited scope of pertinent issues under § 28-1385(I) "by considering the constitutionality of the stop." *Id.* at ¶4. Our supreme court later ordered the *Pinedo* opinion depublished but otherwise denied review. 201 Ariz. 474, 38 P.3d 12 (2002). That order, although depriving *Pinedo* of any precedential force or effect, "was, at best, ambiguous" and does not control our resolution of this case. *Martinez v. Industrial Comm'n*, 192 Ariz. 176, ¶15, 962 P.2d 903, ¶15 (1998) (depublication order signified supreme court "disapproved of 'something,' . . . but it was not clear what").

from an anonymous caller[2] who reported having seen a woman, whom the caller believed to be intoxicated, staggering around the terminal. The caller described the woman's hair and clothing and reported that she was boarding a shuttle van run by one of two extended-stay parking lot operators near the airport. TAAP Sergeant Ivanoff contacted the booth attendants of both lots and asked them to watch for a person fitting that description. Moments later, booth attendants at Park N' Save notified TAAP that they believed that the woman TAAP was seeking was at their exit booth.

¶3 Ivanoff arrived at Park N' Save at 7:48 p.m. and positioned his patrol car at the payment booth in front of the vehicle, blocking its exit. Ivanoff then walked toward the passenger side of the vehicle and noted that the driver's clothes and hairstyle were consistent with the caller's description and that the car's engine was running and in drive, although the vehicle was stopped at the booth. As Ivanoff reached the driver-side window, he told the driver he wished to speak with her and asked her to step out of the car. He then noticed a very strong odor of alcohol emanating from her face and mouth, that she appeared confused, that her speech was slurred, and that her eyes were bloodshot and watery. Because Ivanoff recognized those as signs of intoxication, he called TAAP Officer Price to perform field sobriety tests.

¶4 Price arrived shortly thereafter and spoke with the driver, who identified herself as Tornabene and consented to undergo some field sobriety tests. Price smelled a strong odor of alcohol on her breath and observed that her speech was slurred, that her eyes were watery and bloodshot, and that she swayed a bit as she stood. Price performed the Horizontal Gaze

___

[2]TAAP Officer Price testified that he believed the caller may have been a Southwest Airline employee.

3

Nystagmus (HGN) test on Tornabene and noted all six cues of impairment under the test. Tornabene told Price she would not take any additional tests until she had spoken with her attorney. Price then assisted Tornabene in contacting her attorney by cellular telephone. After speaking with Tornabene, the attorney spoke with Price, inquiring about testing procedures and what would happen if Tornabene refused additional testing. Price informed him that TAAP would decide whether to arrest Tornabene for DUI based on the information they had at that point. When the attorney asked Price to wait until he arrived before conducting any more tests, Price informed him that they were working under a two-hour time limit[3] in which to "obtain some breath, blood or other bodily substance" evidence. The attorney stated that he would come out to meet them, and Price said, "fine."

¶5        Price then spoke with his supervisor, TAAP Sergeant Riley, about the attorney's request. Riley told Price that because of the time constraints involved in a DUI investigation, Price could not delay the decision whether to arrest Tornabene until her attorney arrived. Based upon his observations and the results of the field sobriety test, Price arrested Tornabene at 8:37 p.m., handcuffed her, and read her the *Miranda*[4] warnings. He then read her the following statements from an "Admin Per Se/Implied Consent Affidavit" form:

> Arizona law requires you to submit to and successfully complete
> tests of breath, blood or other bodily substance as chosen by the law
> enforcement officer to determine alcohol concentration or drug

---

[3]Price apparently was referring to A.R.S. § 28-1381(A)(2), which currently criminalizes operating a motor vehicle if a person "has an alcohol concentration of 0.08 or more within two hours of driving." At the time of Tornabene's arrest in September 2000, that statute required an alcohol concentration of 0.10 or more. *See* 2000 Ariz. Sess. Laws, ch. 4, § 2.

[4]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

content. The law enforcement officer may require you to submit to two or more tests. You are required to successfully complete each of the tests.

If the results of the tests indicate your alcohol concentration is .10 or above or .04 or above in a commercial vehicle, your Arizona driver license/permit or nonresident driving privilege will be suspended for not less than 90 consecutive days.

If you refuse to submit or do not successfully complete the specified tests, your Arizona driver license/permit or nonresident driving privilege will be suspended for 12 months, or for 2 years if there is a prior implied consent refusal, within the last 60 months, on your record. You are, therefore, required to submit to the specified tests.

When Price then asked the question on the form, "Will you submit to the specified tests?," Tornabene did not respond either yes or no. Instead, she told Price he should be reading this to her lawyer and that she would not answer until the lawyer arrived. At that point, Price read the following statement to Tornabene, as required by the form if the person being questioned "unreasonably delays the completion of test": "You are not entitled to further delay taking the tests for any reason. Further delay will be considered refusal to submit to the tests." Riley then drove Tornabene to pretrial services at the Pima County Jail to process Tornabene's arrest, with the hope that Tornabene would submit to chemical breath testing there.

¶6 While en route to the jail, Tornabene's attorney called Riley on her cellular telephone and asked to speak with Tornabene. Because Tornabene was in the back seat behind security screening, however, Riley informed the attorney that he would have to talk with her unconfidentially by speaker telephone.[5] Tornabene and her attorney discussed whether she should

---

[5]Tornabene does not raise as an issue the lack of confidentiality during the second telephone consultation with her attorney.

submit to a breathalyzer test. The attorney advised her to take the test, and Tornabene stated that she would. Riley recommended, and the attorney agreed, that he should go to pretrial services so that Tornabene could be released to him that night.

¶7 When Riley and Tornabene arrived at the jail, Riley asked Pima County Pretrial Services staff to send Tornabene's attorney back to the testing area when he arrived. Staff refused that request, however, explaining that they did not permit any outside persons, including attorneys, into the area where they kept arrested persons. At 9:28 p.m., as Riley prepared to administer the breathalyzer test, Tornabene told Riley that she would not take the test without her attorney present. By that time, the attorney apparently had arrived but had been refused entry to the testing area. Riley informed Tornabene that staff would not allow the attorney into the testing area and asked her again to take the test, but Tornabene repeated that she wanted her attorney present. At 9:36 p.m., just short of two hours after Ivanoff had stopped Tornabene, Riley read and served on Tornabene the order of suspension. About ten or fifteen minutes later, after placing Tornabene in a holding cell, Riley spoke with Tornabene's attorney, who asked if he could once again try to convince Tornabene to take the test. Riley told him it was too late.

¶8 After an evidentiary hearing pursuant to § 28-1321(G) and (K), at which only the three TAAP officers testified, the ALJ entered written findings of fact and suspended Tornabene's license for twelve months. On Tornabene's petition for review pursuant to § 28-1321(M), after briefing and oral argument by counsel, the superior court concluded that the police had lacked "probable cause to stop" Tornabene and that she had not refused to take the breathalyzer test. On those two grounds, the court vacated the ALJ's decision, finding it "arbitrary, capricious and not supported by the evidence." This appeal by MVD followed.

6

## DISCUSSION

**I.      Scope and Constitutionality of Administrative License Suspension Hearing**

        **A.      Interpretation of Implied Consent Statute**

¶9        Section 28-1321(A), A.R.S., Arizona's implied consent statute,[6] provides in pertinent part:

> A person who operates a motor vehicle in this state gives consent . . . to a test or tests of the person's blood, breath, urine or other bodily substance for the purpose of determining alcohol concentration or drug content if the person is arrested for any offense arising out of acts alleged to have been committed in violation of this chapter . . . while the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor or drugs.  The test or tests chosen by the law enforcement agency shall be administered at the direction of a law enforcement officer having reasonable grounds to believe that the person was driving or in actual physical control of a motor vehicle in this state . . . [w]hile under the influence of intoxicating liquor or drugs.

If a motorist who has been arrested for DUI refuses to submit to or unreasonably delays testing, the law enforcement officer may serve an order of suspension on the motorist, who then can request an administrative license suspension hearing to review that order.  § 28-1321(D), (G), (K). Section 28-1321(K) limits the scope of such hearing to "only the issues of whether:"

> 1.  A law enforcement officer had reasonable grounds to believe that the person was driving or was in actual physical control of a motor vehicle in this state either:
>
>     (a)   While under the influence of intoxicating liquor or drugs.

---

[6]Section 28-1321 was formerly numbered A.R.S. § 28-691.

(b)     If the person is under twenty-one years of age, with spirituous liquor in the person's body.

2.     The person was placed under arrest.

3.     The person refused to submit to the test.

4.     The person was informed of the consequences of refusal.

§ 28-1321(K)(1) through (4). *See also Sherrill v. Department of Transp.*, 165 Ariz. 495, 497-98, 799 P.2d 836, 838-39 (1990); *Owen*, 170 Ariz. at 513, 826 P.2d at 810.

¶10     After the administrative license suspension hearing in this case, the ALJ found that TAAP had had reasonable grounds to believe that Tornabene had been driving while under the influence of intoxicating liquor or drugs; that she had been arrested and had been requested to submit to a breathalyzer test; that she had been warned that refusal to submit to or failure to successfully complete the test would result in suspension of her driver's license for twelve months; and, that she had refused to submit to the test. Consequently, the ALJ suspended Tornabene's license for twelve months. § 28-1321(B).

¶11     On review, the superior court vacated the ALJ's order. Citing *State v. Altieri*, 191 Ariz. 1, 951 P.2d 866 (1997), the court found that TAAP had "lacked sufficient probable cause to stop [Tornabene] on suspicion of [DUI] pursuant to A.R.S. § 28-1381." Therefore, the court ruled, the police had "no legal basis to demand that she take the breathaly[z]er test." The superior court implicitly concluded that the determination of whether the "law enforcement officer had reasonable grounds to believe that [a motorist] was driving or was in actual physical control of a motor vehicle . . . [w]hile under the influence of intoxicating liquor," as required under § 28-

8

1321(K)(1)(a), also requires a predicate finding that the investigatory stop that ultimately led to those grounds for belief was lawful.

¶12     MVD contends the superior court erroneously considered whether TAAP's stop of Tornabene's vehicle had been lawful, arguing that § 28-1321(K) expressly limits the scope of issues for administrative review. Tornabene counters that the validity of the stop was necessarily part of the superior court's review, asserting that under the Fourth Amendment to the United States Constitution, "reasonable grounds to believe a person was driving while under the influence means reasonable suspicions [sic] for the stop and probable cause for the arrest."[7] Whether the superior court erred in considering the legality of the stop as a basis for vacating the ALJ's suspension order is a question of law that involves statutory interpretation and constitutional issues that are subject to our de novo review. *In re United States Currency in the Amount of $315,900.00*, 183 Ariz. 208, 211, 902 P.2d 351, 354 (App. 1995); *see also Koller v. Arizona Dep't of Transp.*, 195 Ariz. 343, ¶8, 988 P.2d 128, ¶8 (App. 1999). "Because we decide cases on nonconstitutional grounds if possible," we first address the statutory issue of whether § 28-1321(K) required the ALJ to determine whether TAAP had legally stopped Tornabene's vehicle. *Ramirez v. Health Partners of Southern Arizona*, 193 Ariz. 325, ¶10, 972 P.2d 658, ¶10 (App. 1998).

---

[7]Although Tornabene's counsel questioned the TAAP officers at the license suspension hearing about the circumstances surrounding the stop, we note that Tornabene did not specifically raise or argue any Fourth Amendment issues in the administrative proceedings before the ALJ. Her failure to do so arguably waived those issues. *Pavlik v. Chinle Unified Sch. Dist. No. 24*, 195 Ariz. 148, ¶8, 985 P.2d 633, ¶8 (App. 1999). But by failing to object on that basis to Tornabene's Fourth Amendment arguments either in superior court or on appeal, MVD has "waived [any] waiver argument" it otherwise could have made. *Id.* at ¶28.

¶13 "Our primary goal in interpreting statutes is to discern and give effect to legislative intent." *Hobson v. Mid-Century Ins. Co.*, 199 Ariz. 525, ¶8, 19 P.3d 1241, ¶8 (App. 2001). "We first consider the language of the statute and, if it is unclear, turn to other factors, including 'the statute's context, subject matter, historical background, effects, consequences, spirit, and purpose.'" *Norgord v. State ex rel. Berning*, 201 Ariz. 228, ¶7, 33 P.3d 1166, ¶7 (App. 2001), *quoting id.*

¶14 Section 28-1321(K) expressly and clearly states that the scope of an administrative license suspension hearing "shall include only the issues" set forth therein, which do not include any issues relating to the validity of the law enforcement officer's stop of the motorist's vehicle. As MVD points out, this court stated in *Owen*: "There is no requirement under the implied consent statute that the arrest be a valid arrest or that [the arrestee] be convicted for the offense." 170 Ariz. at 513, 826 P.2d at 810. Tornabene correctly observes, however, that the validity of the arrest was not at issue in *Owen*, whereas the validity of the stop leading to Tornabene's arrest is at issue here.[8] Nonetheless, to the extent the foregoing statement in *Owen*, although arguably dicta, suggests that MVD is not statutorily required to establish reasonable suspicion for the stop, we agree.

¶15 Even if § 28-1321(K) were not clear, other factors support MVD's argument. "The purpose of the implied consent law is to remove from Arizona highways those drivers who may

---

[8]Tornabene does not contend TAAP lacked probable cause to arrest her for DUI. But assuming the requisite showing of "reasonable grounds" under § 28-1321(K)(1) is equivalent to a probable cause standard, *see Pearson v. Motor Vehicle Division*, 181 Ariz. 235, 237, 889 P.2d 28, 30 (App. 1995); *Smith v. Arizona Dep't of Transp.*, 146 Ariz. 430, 432, 706 P.2d 756, 758 (App. 1985), MVD made such a showing here. *See* ¶30, *infra*.

10

be a menace to themselves and others because of intoxication." *Sherrill*, 165 Ariz. at 498, 799 P.2d at 839. "The sanction of administrative license suspension for refusal to submit to the test was enacted to assure that licenses of dangerous drivers are revoked quickly, and to increase the certainty that a drunk driver receives a penalty even if that driver provided no evidence of intoxication." *Id.*, *citing* Minutes of the Committee on Judiciary, Arizona Senate, April 7, 1987, H.B. 2273, at 14. *See also Martin v. Superior Court*, 135 Ariz. 258, 261, 660 P.2d 859, 862 (1983) (Arizona legislature determined that speedy method of handling drunk drivers was imperative to combat highway carnage); *cf. State v. Cabrera*, 202 Ariz. 296 n.2, 44 P.3d 174 n.2 (App. 2002) ("[T]he goal of administrative [drivers' license] suspension is to remove drunk drivers from the streets."); *Marzolf v. Superior Court*, 185 Ariz. 144, 150, 912 P.2d 1373, 1379 (App. 1995) (license suspension for DUI is meant to protect public by removing drunk drivers from the road and is rationally related to remedial goal of increasing safety).

¶16     Thus, the unambiguous language of § 28-1321(K), which limits the scope of the hearing to "only the [four] issues" prescribed therein, combined with the obvious spirit, purpose, context, and effect of the implied consent statute, *see Norgord*, establish a clear legislative intent to limit the issues for administrative review, not expand them to include consideration of the constitutional validity of the investigatory stop leading to a criminal DUI arrest. As our supreme court has stated, a civil license suspension proceeding for a DUI arrestee's refusal of testing is "separate from and unrelated to" a criminal prosecution for DUI, and the "outcome of one proceeding usually will not have any effect on the outcome of the other." *Sherrill*, 165 Ariz. at 498, 799 P.2d at 839. In sum, we find nothing in § 28-1321 or its underlying rationale to suggest any legislative intent to incorporate all the procedural protections available to a DUI criminal

11

defendant into the civil license suspension process. Rather, the legislature apparently intended such hearings to narrowly focus, inter alia, on whether the law enforcement officer "had reasonable grounds to believe" that the motorist had been driving while under the influence of alcohol or drugs, regardless of the circumstances of the underlying stop. § 28-1321(K).

¶17        Accordingly, we hold that the validity of an investigatory stop leading to a DUI arrest is outside the proper scope of an administrative license suspension hearing under § 28-1321(K). We find persuasive support for that conclusion in several out-of-state cases in which similar statutes have been construed. *See*, *e.g.*, *Fishbein v. Kozlowski*, 743 A.2d 1110, 1117 (Conn. 1999) ("[F]ailure to comply with the requirements for criminal prosecution as they apply to investigatory stops should not prevent suspension of the license of a person arrested upon probable cause to believe that he was operating under the influence of intoxicating liquor."); *Powell v. Secretary of State*, 614 A.2d 1303, 1305 (Me. 1992) (administrative hearing officer in license suspension proceeding need not "determine the legality of the stop or whether there was probable cause to stop the vehicle"); *Riche v. Director of Revenue*, 987 S.W.2d 331, 333, 336 (Mo. 1999) (refusing to impose on license suspension statute requirement of "'probable or reasonable cause to stop' for drivers over twenty-one years of age"); *Lopez v. Director, New Hampshire Div. of Motor Vehicles*, 761 A.2d 448, 450 (N.H. 2000) ("A valid arrest and traffic stop, while vital to a criminal proceeding, is not a required predicate under the [license suspension] statute."); *Commonwealth of Pennsylvania, Dep't of Transp. v. Wysocki*, 535 A.2d 77, 79 (Pa. 1987) (alleged illegality of vehicle stop does not prevent suspension of license for refusal to submit to breathalyzer test).

¶18 In contrast, and we think unwisely, other courts have superimposed on their license suspension statutes a requirement that the underlying stop be lawful, even when the statutes contained no such condition. *See*, *e.g.*, *People v. Krueger*, 567 N.E.2d 717, 722 (Ill. App. 1991) ("[W]e are unwilling to conclude that the legislature intended to authorize the suspension of drivers' licenses based on the fruits of illegal arrests."); *Olson v. Commissioner of Pub. Safety*, 371 N.W.2d 552, 556 (Minn. 1985) (investigatory DUI stops that result in license revocation proceedings must comply with Fourth Amendment standards); *State v. Lussier*, 757 A.2d 1017, 1020 (Vt. 2000) ("[I]n permitting defendants in a civil suspension proceeding to dispute whether the processing officer had reasonable grounds to believe that the motorist was driving while intoxicated, the Legislature assumed that a constitutional stop would be a necessary predicate to finding 'reasonable grounds' for suspicion of DUI."). To the extent these cases suggest that the legislature cannot limit the scope of issues in a civil license suspension proceeding, so as to preclude consideration of the validity of the stop that otherwise would be relevant in the criminal context, we disagree.

## B. Fourth Amendment Considerations

¶19 Of course, a statute cannot circumvent a firmly established constitutional right. *See In re the Amount of $315,900.00*, 183 Ariz. at 213, 902 P.2d at 356 ("A legislative body simply cannot override a constitutional mandate."). However, it is well established that driving in Arizona is not a right, but a privilege, subject to legislative mandate. *Benitez v. Dunevant*, 198 Ariz. 90, ¶26, 7 P.3d 99, ¶26 (2000); *Cabrera*, 202 Ariz. 296, ¶13, 44 P.3d 174, ¶13. And "the law does not give motorists charged with DUI the right to refuse the test; it only gives them the

13

power to refuse and provides for certain consequences of such a refusal." *State v. Krantz*, 174 Ariz. 211, 215, 848 P.2d 296, 300 (App. 1992).

¶20 Tornabene contends, however, that the Fourth Amendment precludes an administrative license suspension absent "a showing of reasonable suspicion for the stop," even when the implied consent statute requires no such showing. We disagree. As noted above, § 28-1321(K) does not expressly require "a showing of reasonable suspicion for the stop" as a prerequisite for administrative suspension of a DUI arrestee's license. To judicially engraft that requirement into the statute, in our view, would be appropriate only if the Constitution compels us to do so.

¶21 Tornabene correctly asserts that the Fourth Amendment applies to "all vehicle stop situations," whether ultimately leading to criminal or civil proceedings. "[T]he fourth amendment applies to *any* governmental action, not just one arising out of possible criminal activity," including "[s]topping an automobile and detaining its driver to serve a traffic citation." *State v. Boudette*, 164 Ariz. 180, 184, 791 P.2d 1063, 1067 (App. 1990).

¶22 Violation of the Fourth Amendment, however, does not invariably preclude the use of evidence derived from the unconstitutional conduct. Rather, the appropriate sanction, if any, for a Fourth Amendment violation depends on the nature of the proceeding in which the illegally obtained evidence will be used and the policy considerations that weigh in favor of or against exclusion of that evidence in such proceeding. As the Missouri court in *Riche* observed, "[t]he United States Supreme Court has repeatedly held that the use of evidence obtained in violation of the fourth amendment does not violate the Constitution," depending on the nature of the proceedings. 987 S.W.2d at 334. *See*, *e.g.*, *United States v. Leon*, 468 U.S. 897, 906, 104

14

S. Ct. 3405, 3411-12, 82 L. Ed. 2d 677, 687-88 (1984) (exclusionary rule should not apply to bar prosecution's use of evidence obtained by officers acting in reasonable reliance on search warrant issued by detached and neutral magistrate but ultimately found to be invalid); *Stone v. Powell*, 428 U.S. 465, 482, 486, 96 S. Ct. 3037, 3046, 3048-49, 49 L. Ed. 2d 1067, 1080-81, 1083 (1976) (no federal habeas corpus relief available to state prisoner on ground that evidence obtained in unconstitutional search or seizure was introduced at trial, when he or she previously had full and fair opportunity at state level to litigate Fourth Amendment claim); *United States v. Janis*, 428 U.S. 433, 447, 96 S. Ct. 3021, 3028-29, 49 L. Ed. 2d 1046, 1056-57 (1976) (in federal civil tax proceeding, exclusionary rule does not preclude evidence obtained by state officer in good faith reliance on warrant later found defective).

¶23        Thus, assuming arguendo that TAAP lacked reasonable suspicion under the Fourth Amendment to justify their stop of Tornabene's vehicle based on an anonymous tip uncorroborated by independent observations by the police, *see Altieri*,[9] suspension of her license under § 28-1321(K) would not necessarily be invalid on that basis unless the exclusionary rule were applied to the civil license suspension proceeding. Neither the United States Supreme Court nor any Arizona court has applied the exclusionary rule in a purely civil proceeding as a remedy for violation of the Fourth Amendment. *See Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 363-64, 118 S. Ct. 2014, 2019-20, 141 L. Ed. 2d 344, 351-52 (1998) (parole boards

_____

[9]The parties disagree about whether TAAP had reasonable suspicion to stop Tornabene's vehicle under the principles set forth in *Altieri*. We do not address that issue, however, because we have already determined it is outside the statutory scope of an administrative license suspension hearing. And, as discussed below, resolution of that issue is not constitutionally required in this context.

not required by federal law to exclude evidence obtained in violation of Fourth Amendment); *Immigration & Naturalization Service v. Lopez-Mendoza*, 468 U.S. 1032, 1040-42, 104 S. Ct. 3479, 3484-85, 82 L. Ed. 2d 778, 787-88 (1984) (in civil immigration deportation hearing, exclusionary rule does not preclude evidence derived from peaceful but allegedly unlawful arrest); *Nystrom v. Massachusetts Cas. Ins. Co.*, 148 Ariz. 208, 211, 713 P.2d 1266, 1269 (App. 1986) ("[A]bsent evidence of egregious and repetitive abuse of state power, the exclusionary rule is inapplicable to civil cases."). We see no reason to do so here in the context of a purely civil proceeding that does not implicate any constitutional rights.

¶24        "The exclusionary rule 'is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *State v. Fisher*, 141 Ariz. 227, 240, 686 P.2d 750, 763 (1984), *quoting United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620, 38 L. Ed. 2d 561, 571 (1974). Whether to apply that rule to a particular fact situation requires "weigh[ing] the benefits of vindicating a constitutional right through the deterrent effect of the exclusionary rule against the possibility that other deterrents may exist which would accomplish the same result at less cost to society." *State v. Bolt*, 142 Ariz. 260, 267, 689 P.2d 519, 526 (1984); *see also State v. Atwood*, 171 Ariz. 576, 667, 832 P.2d 593, 684 (1992) (J. Corcoran, specially concurring).

¶25        Evidence obtained in violation of the Fourth Amendment would be inadmissible in criminal DUI proceedings. *See Wysocki*, 535 A.2d at 79; *cf. State v. Richcreek*, 187 Ariz. 501, 930 P.2d 1304 (1997). Consequently, application of the exclusionary rule in civil license suspension proceedings would likely have only a marginal, if any, deterrent effect on police misconduct. *See Fishbein*, 743 A.2d at 1118; *Motor Vehicle Admin. v. Richards*, 739 A.2d 58,

16

69 (Md. 1999); *Powell*, 614 A.2d at 1307; *Riche*, 987 S.W.2d at 335. When a law enforcement officer stops a motorist on suspicion of DUI, the officer's "primary interest" is most likely criminal prosecution, rather than the collateral consequence of license suspension. *Fishbein*, 743 A.2d at 1118-19. Because use in the license suspension hearing of evidence obtained through an improper stop "'falls outside the offending officer's zone of primary interest,'" exclusion of such evidence in that civil context would not significantly affect a police officer's motivation in conducting a vehicle stop. *Id.*, *quoting Janis*, 428 U.S. at 458, 96 S. Ct. at 3034, 49 L. Ed. 2d at 1063. The officer is "already 'punished' by the exclusion of the evidence in the state criminal trial[, which] necessarily, is of substantial concern to him [or her]." *Id.* at 1119, *quoting Janis*, 428 U.S. at 448, 96 S. Ct. at 3029, 49 L. Ed. 2d at 1057.

¶26    Thus, exclusion of evidence from the license suspension hearing would have little deterrent value as compared to the benefit of having otherwise reliable evidence that a motorist has been driving while intoxicated available to the ALJ. Moreover, applying the exclusionary rule in the administrative license suspension context would "unnecessarily complicate and burden" the proceeding, which is designed primarily to focus on the issue of whether the motorist was operating a vehicle under the influence of intoxicants. *Powell*, 614 A.2d at 1307; *see also Riche*, 987 S.W.2d at 334; *Owen*, 170 Ariz. at 513, 826 P.2d at 810. Based on our evaluation of the relevant policies and our weighing of the relative benefits and detriments, we hold that the exclusionary rule, although required to preserve and protect Fourth Amendment rights in the

17

criminal context, should not be applied to civil license suspension hearings under § 28-1321(K). *See Fishbein*, 743 A.2d at 1118-19; *Powell*, 614 A.2d at 1306-07; *Riche*, 987 S.W.2d at 335.[10]

¶27    We disagree with the superior court's statement that, "to hold [that probable cause is not required to stop a motorist under the implied consent statute] would allow the State virtually the unlimited right to stop citizens and force them to take a breathaly[z]er test for any reason or for no reason at all." First, law enforcement officers are only required to have a reasonable, articulable suspicion of criminal activity, not the higher standard of probable cause, before making an investigatory stop. *See Altieri*, 191 Ariz. 1, ¶8, 951 P.2d 866, ¶8. *See also State v. O'Meara*, 198 Ariz. 294, ¶10, 9 P.3d 325, ¶10 (2000); *Richcreek*, 187 Ariz. at 503-04, 930 P.2d at 1306-07. Second, the statute plainly requires that law enforcement officers have "reasonable grounds to believe" that a motorist was driving or in actual physical control of a motor vehicle while under the influence of alcohol or drugs before requesting that the motorist submit to testing. § 28-1321(A), (K). Finally, we find it unlikely that law enforcement officers, lacking any reasonable suspicion of DUI, will assign scarce resources to randomly stop motorists on the chance that the officers will develop reasonable grounds to permit them to request the motorist to submit to testing. *See Fishbein*, 743 A.2d at 1119.

¶28    The record does not reflect, nor are we aware of, any cases or statistical studies that suggest a pattern of police misconduct with respect to DUI stops. The prospect of officers knowingly stopping vehicles, without reasonable suspicion of criminal activity, for the purpose

---

[10]Although other jurisdictions have reached a different conclusion, in our view those courts gave undue weight to the additional deterrent effect that they perceived application of the exclusionary rule in this context would provide. *See Olson v. Commissioner of Pub. Safety*, 371 N.W.2d 552, 556 (Minn. 1985); *State v. Lussier*, 757 A.2d 1017, 1026 (Vt. 2000).

18

of seeking to suspend motorists' driver's licenses if they refuse to submit to BAC testing is remote at best. Indeed, the United States Supreme Court has made it clear that random stops of vehicles absent some articulable and reasonable suspicion of wrongdoing are unconstitutional. *See Delaware v. Prouse*, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660, 673 (1979); *accord Richcreek*, 187 Ariz. at 503, 505, 930 P.2d at 1306, 1308; *cf. City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000) (city's drug interdiction checkpoints violated Fourth Amendment). Consequently, it strikes us as extremely unlikely that officers would use such tactics merely with the hope of obtaining license suspensions, knowing that evidence of intoxication obtained from such an encounter would be inadmissible in any criminal DUI prosecution and that clearly impermissible police conduct could subject officers to civil liability. *See* 42 U.S.C. § 1983.

¶29 Review of the ALJ's decision, both on appeal and at the superior court level, is limited to whether that decision was "arbitrary, capricious, or an abuse of discretion." *Edwards v. Arizona Dep't of Transp.*, 176 Ariz. 137, 140, 859 P.2d 760, 763 (App. 1993). *See also Caretto v. Arizona Dep't of Transp.*, 192 Ariz. 297, ¶7, 965 P.2d 31, ¶7 (App. 1998). The superior court erred in so characterizing the ALJ's ruling based on the allegedly invalid stop of Tornabene's vehicle.

¶30 Competent evidence, including the officers' observations after the stop and the results of the HGN test, supported the ALJ's finding that TAAP had reasonable grounds to believe that Tornabene had been driving under the influence of intoxicants. *See Pearson v. Motor Vehicle Division*, 181 Ariz. 235, 238, 889 P.2d 28, 31 (App. 1995). *See also State v. Superior Court*, 149 Ariz. 269, 280, 718 P.2d 171, 182 (1986) (HGN test sufficiently reliable to establish probable

19

cause to arrest for DUI); *Pharo v. Tucson City Court*, 167 Ariz. 571, 572-73, 810 P.2d 569, 570-71 (App. 1990); *State v. Superior Court*, 191 Ariz. 182, 186, 953 P.2d 926, 930 (App. 1997). Tornabene does not argue otherwise on appeal, nor does she deny that TAAP properly warned her of the consequences for refusing to submit to testing in accordance with § 28-1321(B). But because Tornabene does dispute the ALJ's finding that she refused to submit to testing, we next address that issue.

## II. Refusal to Submit to Testing

¶31 MVD bore the burden of establishing by a preponderance of the evidence that Tornabene refused to undergo chemical breath testing. *See Sherrill*, 165 Ariz. at 498, 502, 799 P.2d at 839, 843. Under § 28-1321(B), "[a] failure to expressly agree to the test or successfully complete the test is deemed a refusal." The superior court found that Tornabene's "request to see and speak to her attorney, who was present at the Pre-Trial Services Office adjacent to the area where the breathaly[z]er test was to be conducted, was not a refusal to take the test," reasoning that a DUI arrestee has a federal and state constitutional right to "seek the advice of counsel prior to taking a definitive test." Thus, the superior court overturned the ALJ's decision on that ground as well.

¶32 We first note that our supreme court has consistently rejected the proposition that a motorist who faces civil license suspension is entitled to assistance of counsel in deciding whether to submit to chemical breath testing. *See State v. Juarez*, 161 Ariz. 76, 80, 775 P.2d

20

1140, 1144 (1989); *Kunzler v. Miller*, 154 Ariz. 570, 571, 744 P.2d 671, 672 (1987); *Campbell v. Superior Court*, 106 Ariz. 542, 549-50, 479 P.2d 685, 692-93 (1971). In criminal DUI proceedings, however, a qualified right to counsel has been established. *See Kunzler v. Superior Court*, 154 Ariz. 568, 570, 744 P.2d 669, 671 (1987) ("while the accused does not have the right to interrupt a continuing investigation in order to consult with an attorney, if there is no disruption of the investigation, the defendant may exercise the right to counsel"). *See also Hively v. Superior Court*, 154 Ariz. 572, 574, 744 P.2d 673, 675 (1987); *McNutt v. Superior Court*, 133 Ariz. 7, 9, 648 P.2d 122, 124 (1982). As noted above, a license suspension hearing under § 28-1321(K) is a civil proceeding and, as such, Tornabene had no constitutionally-protected right to consult with her attorney about taking the test. *Campbell*.

¶33    Even so, the record reflects that TAAP gave Tornabene two opportunities to consult with her attorney before requesting that she submit to the test at the jail. In addition, Tornabene did not ask to "see and speak" with her attorney at the jail, as the superior court found, but rather requested his *presence* during the test. As the ALJ correctly ruled, because Arizona motorists who face civil license suspension proceedings have no right to consult with counsel about whether to submit to breath testing, it follows that they have no right to the presence of counsel during testing. Moreover, in view of the non-testimonial nature of chemical breath testing, even criminal suspects are not entitled to presence of counsel during the test. *See Campbell*, 106 Ariz. at 552 n.8, 479 P.2d at 695 n.8; *State v. Lee*, 184 Ariz. 230, 233-34, 908 P.2d 44, 47-48 (App. 1995).

¶34    The record supports the ALJ's finding that Tornabene refused to submit to testing. Before arriving at the jail, TAAP had advised her that unreasonable delay in taking the test would be deemed a refusal. Although Sergeant Riley did not oppose the presence of Tornabene's

21

attorney during testing, jail regulations apparently prevented that. When told that it would not be possible for her attorney to be present during her test, Tornabene again stated that she was unwilling to undergo testing without him.

¶35 An arrested motorist is deemed to have refused to submit to testing when his or her conduct "is such that a reasonable person in the officer's position would be justified in believing that such motorist was capable of refusal and manifested an unwillingness to submit to the test." *Campbell*, 106 Ariz. at 553, 479 P.2d at 696; *see also Sherrill*, 165 Ariz. at 499, 799 P.2d at 840 (refusal occurs "when a driver's words or conduct evidence noncooperation with the test"). As the two-hour period[11] for establishing Tornabene's blood alcohol concentration was rapidly nearing an end, Tornabene told Riley she was unwilling to take the test unless her attorney was present, knowing that jail regulations prohibited the attorney's presence. Under these circumstances, Riley was reasonably justified in believing that Tornabene was manifesting an unwillingness to submit to the test. *See Willis v. State*, 145 Ariz. 302, 701 P.2d 10 (App. 1985). Because the record contains competent evidence to support the ALJ's finding that Tornabene had "refused to submit to the test" after having been requested to do so and warned of the consequences of a refusal, "[t]he superior court [was] not permitted to substitute its judgment" on that issue for that of the ALJ. *Owen*, 170 Ariz. at 512, 826 P.2d at 809. *See also Ontiveros.*

¶36 We are unpersuaded by Tornabene's further contention that she was confused about her right to counsel relating to chemical breath testing in light of the *Miranda* warnings she had received and her knowledge that her attorney was attempting to meet with her. She argues that,

---

[11]*See* § 28-1381(A)(2).

22

under these circumstances, *Caretto* and *Gaunt v. Motor Vehicle Division*, 136 Ariz. 424, 666 P.2d 524 (App. 1983), required TAAP to further admonish her that requesting an attorney could not delay her submission to testing. The record does not support this contention.

¶37 Although TAAP attempted to facilitate as much communication as possible between Tornabene and her attorney, both at the arrest site and on the way to the jail, jail regulations prevented the attorney's presence at her testing. Tornabene was aware of that before Riley asked her to submit to testing for the last time. Tornabene had already been warned that she was not entitled to further delay testing "for any reason," and that "[f]urther delay will be considered refusal to submit to the tests," yet she again stated that she would not take the test unless her attorney was present.[12] The record does not support Tornabene's claim of confusion, and we find *Gaunt* and *Caretto* inapposite.

## DISPOSITION

¶38 We reverse the superior court's order and reinstate the ALJ's order that suspended Tornabene's driver's license.

_____
JOHN PELANDER, Judge

CONCURRING:

---

[12]Unlike *Ricard v. Arizona Department of Transportation*, 187 Ariz. 633, 639, 931 P.2d 1143, 1149 (App. 1997), on which Tornabene also relies, this case does not involve a breathalyzer operator who "impose[d] arbitrary restrictions upon an arrested motorist's behavior during the testing process . . . and then use[d] a violation of those restrictions as the basis for determining that the motorist ha[d] refused the test."

_____
PHILIP G. ESPINOSA, Chief Judge


_____
WILLIAM E. DRUKE, Presiding Judge