IN THE COURT OF APPEALS



FILED BY CLERK

NOV 13 2006

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | 2 CA-CR 2005-0181 |
| Appellee, | ) | DEPARTMENT B |
| | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| RICKY LEE SABIN, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause Nos. CR20041696 and CR20050236 (Consolidated)

Honorable Nanette M. Warner, Judge

AFFIRMED

---

Terry Goddard, Arizona Attorney General
  By Randall M. Howe and Diane M. Acosta
                                                                    Phoenix
                                                    Attorneys for Appellee


Robert J. Hooker, Pima County Public Defender
  By Kristine Maish
                                                                    Tucson
                                                    Attorneys for Appellant

---

E C K E R S T R O M, Presiding Judge.

¶1     Ricky Lee Sabin appeals his conviction following a bench trial of sexual conduct with a minor and continuous sexual abuse of a minor, class two felonies. The sole victim of both offenses was K., Sabin's sixteen-year-old daughter, who died from a single, self-inflicted gunshot wound on April 30, 2004. For the reasons set forth below, we affirm.

**Background**

¶2     We view the evidence and the reasonable inferences therefrom in the light most favorable to supporting the convictions. *State v. Ramsey*, 211 Ariz. 529, ¶ 2, 124 P.3d 756, 759 (App. 2005). Responding to a report of a possible suicide, officers of the Marana Police Department were dispatched to the Sabin residence. The first officer to arrive, Joshua Corn, immediately encountered two teenagers, Ron and Ashley, outside the house. Both of them were "visibly distraught and upset." After Corn entered the house through the patio door, he discovered K.'s body in a hallway bathroom and a .357 revolver in her lap.

¶3     Detective Richard Palma interviewed both Ron and Ashley a few hours later. Ron, who had been K.'s boyfriend since September 2003, stated that he had been talking to K. on the telephone that afternoon when he heard a gunshot and the line went silent. He and Ashley, a mutual friend of Ron and K., immediately drove to the Sabin residence. When they arrived, Ron entered the house through a rear door, called to K., and ultimately found her body in the bathroom. Ron called 911. Ron told Palma that he had "no clue why" K. would have committed suicide, that their relationship was fine, that K. had not been

depressed, and that she had not been struggling with difficulties at school or at home. When Palma asked Ron if K. had kept a diary, Ron responded that it was "possible."

**¶4** Ashley told Palma that, although she did not know what would have immediately precipitated the suicide, K. "had trouble with her dad." When pressed to explain the "trouble," Ashley said that Sabin had "raped" and "sexually molested" K. since she was seven or eight years old.

**¶5** The police then searched K.'s bedroom and discovered her diary. While searching the house, Officer Corn read aloud select passages from the diary. In those passages, K. stated she had been sexually abused by both her father and grandfather and that if she ever found out she was pregnant by her father, she would immediately kill herself. Officers did not obtain a search warrant until after they had searched K.'s bedroom and had discovered the diary.

**¶6** Marana Police Detective John Santoro interviewed Ashley a second time a few hours later at the main station of the Marana Police Department. During that interview, Ashley described the details K. had divulged to Ashley about the extent of, and manner in which, Sabin had chronically abused her. Ashley told Santoro that K. had said she had tried to resist Sabin and that the abuse would happen as often as a couple of times per week. According to Ashley, K. had stated that Denise, K.'s mother, had learned about the abuse the previous fall during a "family discussion" and had considered divorcing Sabin. During

3

this discussion with Santoro, Ashley confirmed that K. had kept a diary although Ashley had never seen it.

¶7 Several hours later, Detective Santoro and Bradley Roach, a deputy county attorney, interviewed Sabin at a police substation. Before proceeding, Santoro advised Sabin that he was not under arrest and that the police simply wanted to "find out what [had] happened" to K. After Santoro read Sabin the *Miranda*[1] warnings, Sabin agreed to continued questioning. Sabin initially told the police that he and K. "had a pretty good, great relationship" and that they were "very close."

¶8 Santoro then told Sabin that police had discovered K.'s diary and "found some things she wrote in it that . . . concerned [them]." Sabin responded that K. had recently grown "more and more defiant." But, when Roach asked Sabin about "a real big family discussion around like September, October or maybe even November of last year," Sabin admitted he had sexually abused K. since she was seven or eight years old. For the next hour, Sabin offered details of the systematic abuse that had started as "fondling" and escalated over the years to include masturbatory acts and both oral and vaginal intercourse. The officers arrested Sabin at the conclusion of the interview.

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

¶9        On May 3, 2004, Ron volunteered to provide a second statement to police. Ron revealed that K. had told him Sabin had been molesting her for nearly ten years. Ron described the abuse as follows:

> I remember her telling me that he held her, he held her down with one hand and he would just forcefully throw her down[,] rip her clothes off and just do whatever he felt like. He would, he would sexually do these things and he would anally do these things . . . [E]verything that you could possibly think of . . . was done.

When asked if Sabin had "penetrated [K.] with his penis," Ron responded, "Yes . . . I asked her specifically how many times and she said over three hundred times."

¶10        Thereafter, a Pima County grand jury indicted Sabin on one count of continuous sexual abuse of a child, two counts of sexual conduct with a minor under fifteen, one count of sexual abuse of a minor under fifteen, and five counts of sexual conduct with a minor. The same indictment charged Denise with child abuse, obstructing a criminal investigation, and failing to report Sabin's sexual abuse of their daughter.[2] Sabin moved to suppress both K.'s diary and his confession, contending the diary was the product of an illegal search and his confession was its fruit. Sabin also moved to suppress K.'s statements to Ron and Ashley on the ground that their admission would violate his Sixth Amendment right to confront a witness against him. Finally, he argued that the state lacked a *corpus delicti* for the crime.

---

[2]In May 2005, Denise pled guilty to child abuse, non-death or serious injury, a class six felony.

¶11 Following a two-day hearing, the trial court granted defendants' motion to suppress K.'s diary because it had been seized by the police in violation of the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution.[3] But, the trial court rejected Sabin's contention that his confession was the fruit of an illegal search, finding his statements would be admissible at trial. The trial court also found that K.'s statements to Ashley and Ron were admissible because they were not testimonial and therefore did not violate the Sixth Amendment standards recently articulated by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). Finally, the court rejected as premature Sabin's contention that the state had failed to provide the *corpus delicti*.

¶12 After the trial court granted Sabin's motion to suppress the diary, the state dismissed all but two of the charges. In January 2005, the grand jury issued another indictment, charging Sabin with continuous sexual abuse of a minor for committing three or more acts of sexual conduct and/or molestation with K. between May 1999 and January 2002.[4]

¶13 On April 4, Sabin waived his right to a jury trial. At that time, he also stipulated that the court could consider, as part of the bench trial, all the evidence presented

[3]The state does not challenge that finding on appeal.

[4]In March 2005, the state moved to dismiss one count of sexual conduct with a minor, and the court granted that motion.

at the suppression hearing that had not been suppressed. That evidence was reviewed by the court on the first day of a two-day bench trial, although neither Sabin nor counsel were present. During the second day of trial, the state moved to amend the indictment to make it "conform with the evidence" presented, pursuant to Rule 13.5(b), Ariz. R. Crim. P., 17 A.R.S. The trial court granted the motion. Thereafter, the court found Sabin guilty of one count of sexual conduct with a minor and one count of continuous sexual abuse of a minor.

¶14 Sabin waived his Sixth Amendment right to have a jury determine beyond a reasonable doubt the existence of any aggravating circumstances for sentencing purposes. *See Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000) (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"); *see also Blakely v. Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004) (clarifying that the right to jury trial applies to aggravating factors such as those set forth in Arizona's noncapital sentencing scheme). After the trial court found the state had proven two aggravating circumstances—severe emotional harm to the victim and her family and the especially cruel nature of the offenses—it sentenced Sabin to consecutive, aggravated terms of imprisonment totaling thirty-seven years.

¶15 On appeal, Sabin again challenges the admission of his statements to the police and the statements K. had made to Ashley and Ron. He also contends the state failed to satisfy the *corpus delicti* requirement; that he did not knowingly, voluntarily, and

intelligently waive his right to a jury trial; and that the trial court erred in granting the state's motion to amend the indictment.

**Motion to Suppress Inculpatory Statements**

¶16 Sabin contends the trial court erred when it denied his motion to suppress his confession. Sabin argues, as he did below, that the police would not have obtained his confession if they had not first illegally seized K.'s diary and then confronted him with their knowledge of its contents, which included their knowledge that there had been a family meeting the prior autumn. Because the diary was illegally seized, Sabin argues that his inculpatory statements to police were the "fruit of the poisonous tree" and, therefore, inadmissible under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 416 (1963).

¶17 We generally defer to a trial court's decision to suppress evidence and will not disturb the court's ruling on the admissibility of evidence absent an abuse of discretion. *State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 306-07 (App. 2000). But, "to the extent suppression of evidence is based on exclusionary rule principles, we review the suppression order de novo." *Id.* Moreover, *de novo* review is appropriate because the issue of whether Sabin's incriminating statements arose from the illegal seizure of K.'s diary is "a mixed question of fact and law implicating constitutional questions." *State v. Hackman*, 189 Ariz. 505, 508, 943 P.2d 865, 868 (App. 1997). In conducting that review, we consider the evidence presented at the suppression hearing, as well as any reasonable inferences

therefrom, in the light most favorable to upholding the trial court's ruling. *Id*. at 508-09, 943 P.2d at 868-69.

¶18　　　The exclusionary rule generally "requires the suppression at trial of evidence gained directly or indirectly as a result of a government violation of the Fourth, Fifth, or Sixth Amendments," *id.* at 508, 943 P.2d at 868, including any evidence gained as the result of an illegal search and seizure. *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385 (1984); *State v. Bolt*, 142 Ariz. 260, 263, 689 P.2d 519, 522 (1984). The evidence gained by the state's illegal actions, and therefore subject to suppression, need not be physical, but may be verbal as well. *See Wong Sun*, 371 U.S. at 485, 83 S. Ct at 416 ("[V]erbal evidence, which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."). However, to limit the scope of the exclusionary rule to its core purpose—to deter police misconduct[5]—the Supreme Court has identified three contexts wherein the evidentiary fruits of an illegal search may nonetheless be admissible: when the police have a lawful "independent source" for the evidence, when they would have inevitably discovered it by lawful means, or when the causal connection between the discovery of the evidence and the illegality is so "attenuated" that the threat of suppressing that evidence would not

---

[5]The underlying rationale for any application of the exclusionary rule should be to discourage government misconduct. *See Arizona v. Evans*, 514 U.S. 1, 10-11, 115 S. Ct. 1185, 1191 (1995); *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974); *State v. Alfaro*, 127 Ariz. 578, 579-80, 623 P.2d 8, 9-10 (1980); *State v. Booker*, 212 Ariz. 502, ¶ 13, 135 P.3d 57, 59 (App. 2006).

deter the illegal conduct in question. *See State v. Washington*, 120 Ariz. 229, 231, 585 P.2d 251, 253 (App. 1978) (listing limitations and their United States Supreme Court origins); *see also Brown v. Illinois*, 422 U.S. 590, 609, 95 S. Ct. 2254, 2264 (1975) ("[A]ttempt[ing] to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.") (Powell, J. concurring).

¶19 The trial court found that, although K.'s diary had been seized in violation of the Fourth Amendment, Sabin's confession was not the fruit of that constitutional misstep and the exclusionary rule therefore did not apply. In so concluding, the trial court appeared to apply the independent source rule. Under that rule, evidence is not fruit of an illegal search so long as it can be traced to a source independent of the police misconduct. *Segura*, 468 U.S. at 799, 104 S. Ct. at 3385; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 183 (1920); *State v. Gulbrandson*, 184 Ariz. 46, 57-58, 906 P.2d 579, 590-91 (1995); *see also State v. Bolt*, 142 Ariz. 284, 287, 689 P.2d 543, 546 (App. 1983), *aff'd as modified*, 142 Ariz. 260, 689 P.2d 519 (1984) ("Where the evidence sought to be suppressed is the product of an independent source entirely free and distinct from the proscribed police activity, it should be admissible, and not subject to a per se rule of exclusion based solely on the unlawful conduct."). The trial court found "most of the information provided to Mr. Sabin prior to him making inculpatory statements was received from Ashley and Ron . . . [and] there was no information in the diary significantly different

10

from information provided by Ashley and Ron in their interviews prior to Mr. Sabin being questioned." Thus, the trial court implicitly found that the diary was not the state's exclusive source of information that triggered Sabin's confession, and therefore Sabin's confession had a source independent of the Fourth Amendment violation.

¶20 The record supports some, but not all, of the trial court's conclusions. The record establishes that the officers already had learned about the allegations of sexual abuse and the possible existence of a diary during witness interviews that had been conducted before officers found K.'s diary. Even before the police searched K.'s bedroom, Ron had told police that K. may have kept a diary. And Ashley had informed police that K. had claimed she had been raped and molested by Sabin for nearly ten years. The contents of the diary, while considerably more detailed, served only to confirm Ashley's statements that K. had been victimized by Sabin. Thus, independent of the illegal search of Sabin's residence, officers knew generally that K. had claimed Sabin had abused her and that K. had kept a diary.

¶21 On the other hand, neither of the statements that arguably triggered Sabin's confession arose independently from the state's illegal acquisition of the diary.[6] Detective Santoro's assertion that he had read the diary, coupled with Roach's question about the family meeting, preceded Sabin's admissions that he had abused K. As the tape of that

---

[6]Sabin contends the record establishes that Santoro's statement to Sabin that the detective had read the diary had triggered Sabin's confession. The state maintains the record establishes that Roach's comment about the family meeting had triggered it.

dialogue demonstrates, Sabin had shown no indication he would have made any such admissions had Roach and Santoro not confronted him with those statements.

¶22         Both statements causally derived from the state's acquisition of the diary. Santoro's statement to Sabin went beyond the mere claim that Santoro was aware of the diary's existence—a fact supported by an independent source.  Rather, Santoro conveyed to Sabin that he had read the diary and was concerned about its *contents*—a statement arising directly from the state's improper seizure of the diary.  And, although Roach could have acquired his knowledge of the family meeting from either of two sources—by reading the improperly seized diary or from Ashley's second statement to Santoro, Santoro conceded that he had decided to interview Ashley a second time because of the contents of the diary.[7]

¶23         Thus, the record does not support the trial court's suggestion that the state received most of the information triggering Sabin's confession from sources causally independent of the illegal search, specifically the statements of Ashley and Ron.  In fact, Ron provided no information that Sabin had abused K. until long after Sabin had confessed. And, as discussed, Ashley's statements, which Roach utilized to secure the confession, were made during the second interview of Ashley; an interview triggered by the state's illegal seizure of the diary.

---

[7]At the suppression hearing, Santoro was asked, "the reason you were talking with Ashley at 11 o'clock at night was because of the entry you had seen in the journal?"  He responded, "Yes, I wanted to find out firsthand from her what she knew."

12

¶24        We nonetheless agree with the trial court that Sabin's confession should not have been suppressed as fruit of the poisonous tree. *See State v. Nadler*, 129 Ariz. 19, 21-22, 628 P.2d 56, 58-59 (App. 1981) (trial court's "ruling will be affirmed when the correct result is reached even though based upon the wrong reasons"). The Supreme Court has not proscribed the use of all evidence causally connected to the state's illegal action and has explicitly disapproved a rigid, "but for" test in determining what evidence should be suppressed. *See Wong Sun*, 371 U.S. at 487-88, 83 S. Ct. at 417 ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police."); *see also United States v. Leon*, 468 U.S. 897, 910-11, 104 S. Ct. 3405, 3414 (1984) (declining to adopt per se rule of exclusion "that would render inadmissible any evidence that came to light through a chain of causation that began with an illegal arrest"). Our own supreme court has generally summarized the scope of the exclusionary rule in this context observing that "[e]vidence is not classified as a fruit requiring exclusion . . . merely because it would not have been discovered 'but for' the primary invasion" but rather may be admitted notwithstanding the illegality if secured "'by means sufficiently distinguishable to be purged of the primary taint.'" *State v. Fortier*, 113 Ariz. 332, 335, 553 P.2d 1206, 1209 (1976), *quoting Wong Sun,* 371 U.S. at 488, 83 S. Ct. at 417.

¶25        Although the two statements that arguably triggered Sabin's confession were each causally connected in some respect to the state's acquisition of the diary through the

illegal search, we conclude for several reasons that the connection between that search and

Sabin's confession was too attenuated to justify exclusion of the evidence. *See Nardone v.*

*United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 268 (1939) (noting connection between

illegal conduct and evidence "may have become so attenuated as to dissipate the taint"); *see*

*also United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998) ("[A]t *some* point, even

in the event of a direct and unbroken causal chain, the relationship between the unlawful

search or seizure and the challenged evidence becomes sufficiently weak to dissipate any

taint resulting from the original illegality.").[8]  Preliminarily, the record supports the trial

court's implicit finding that Roach's comments to Sabin about the family meeting, rather

than Santoro's about the diary, triggered Sabin's confession.  When Santoro informed Sabin

that K. had entered some passages in her diary that troubled police, Sabin did not inculpate

himself.  Rather, Sabin merely responded that there had been some tension between himself

and K. relating to her desire for more independence as a teenager.  But after Roach asked

Sabin about the family meeting, Sabin reacted emotionally and began to divulge details

about the abuse.[9]

---

[8]Unlike the independent source rule—which requires that there be no connection between the constitutional violation and the evidence at issue—the attenuated connection exception "is triggered by a demonstration that the nature of th[e] causal link is such that the impact of the original illegality upon the obtaining of the evidence is sufficiently minimal that exclusion is not required *despite* the causal link."  1 Kenneth S. Broun et al., *McCormick on Evidence* § 179, at 710 (6th ed. 2006).

[9]During direct examination of Santoro at the suppression hearing, the following colloquy occurred:

14

¶26 As discussed, Roach received the information about the family meeting from Ashley's second statement. And, although Santoro acknowledged that the timing of Ashley's second statement arose from his acquisition of the diary, logic dictates the detective would have pursued a second interview with Ashley under any circumstances, given that during her first interview she had provided evidence that K. had been raped by her father. Thus, the officers did not exploit the illegal search to discover and question a previously unidentified witness. *See, e.g., United States v. Marder*, 474 F.2d 1192, 1195-97 (5th Cir.

---

Q [D]id Mr. Roach bring up the subject of a family discussion that occurred in September or October or perhaps November of 2003?

A Yes, I believe so. . . .

. . . .

Q And do you know what Mr. Roach was referring to?

A Yes, I do.

. . . .

Q . . . And what was the family discussion about?

A From the information I [had] received[,] . . . K[.] had confronted her father in front of her mother and told her what was going on.

Q And in response to that line of questioning . . . did Mr. Sabin begin to talk about sexual misconduct?

A Yes.

15

1973). Rather, as a result of the illegal search, the police merely revisited a known witness who had already volunteered both the fact of a crime itself and its details. Notably, had the police *not* discovered the diary, they would have had *more* of an incentive to talk with Ashley, the only other source of information about the alleged abuse, rather than less. In short, the state's investigative team inevitably would have discovered the details about the family meeting from Ashley, regardless of whether it had improperly acquired the diary—and would have eventually confronted Sabin with that information.

¶27 In reaching this conclusion, we again acknowledge that the core purpose of the exclusionary rule is to deter police misconduct. *See* ¶ 17, *supra*. Here, the trial court aptly effectuated that purpose when it suppressed the diary—which certainly would have been the most potent tangible evidence in this case. *See State v. Strayhand*, 184 Ariz. 571, 586, 911 P.2d 577, 592 (App. 1995), *quoting Michigan v. Tucker*, 417 U.S. 433, 447, 94 S. Ct. 2357, 2365 (1974) ("By refusing to admit evidence gained as a result of . . . [illegal] conduct, the courts hope to instill in those particular investigating officers, or their future counterparts, a greater degree of care toward the rights of an accused."). Extending application of the exclusionary rule to Ashley's statements would only "deter" the police from returning to a lawfully identified witness for further details about an alleged crime that the witness already had brought to their attention. We would not advance any logical purpose by applying the exclusionary rule so as to prohibit officers from following otherwise

non-tainted leads—merely because the fruit of a Fourth Amendment violation arguably accelerated their timing in doing so.

¶28        Moreover, we agree with the trial court's suggestion that Sabin's decision to confess arose from more substantial factors than the mere nuances conveyed in the specific questions chosen by Roach and Santoro. From Ashley's first statement, Roach and Santoro already knew that K. had made statements accusing her father of sexually abusing her. And, as the trial court correctly found, the information in the diary was nothing more than another statement by K. to that same effect. Thus, even had the state not improperly searched Sabin's residence and seized the diary, it would have known about the abuse from K.'s statement to Ashley. And, as the structure of the dialogue between Santoro, Roach, and Sabin demonstrates, the trial court reasonably could have concluded Santoro and Roach would have confronted Sabin with the gist of that accusation, whether they had possessed the diary or not.

¶29        Notably, neither of the specific questions by Santoro or Roach that arguably triggered Sabin's confession contained a concrete accusation of sexual abuse. Rather, they alluded vaguely to a family meeting and troubling entries in K.'s diary. Under such circumstances, we can only surmise that Sabin likewise would have confessed when inevitably confronted with more direct accusations from the mouth of his deceased daughter.

¶30　　　　In short, although Sabin has correctly identified a causal connection between the state's seizure of the diary and Sabin's confession, that causal connection was too tenuous, given the broader circumstances of the case, to justify suppressing that confession.

**Admissibility of Victim's Statements**

¶31　　　　Sabin argues K.'s statements to Ashley and Ron regarding the abuse were admitted in violation of his Sixth Amendment right "to be confronted with witnesses against him." U.S. Const. amend. VI. But we have concluded above that Sabin's own confession to the same acts alleged in K.'s statements was properly admitted. Sabin's confession was detailed and unequivocal. And, although Sabin has vigorously contested its admissibility, he has never challenged its veracity. Any error by the trial court in admitting K.'s statements to Ashley and Ron on the same topic would be "harmless beyond a reasonable doubt," *State v. Comer*, 165 Ariz. 413, 427, 799 P.2d 333, 347 (1990) (appellant not entitled to relief for error if "harmless beyond a reasonable doubt"); *see State v. King*, 212 Ariz. 372, ¶ 36, 132 P.3d 311, 319 (App. 2006) (Confrontation Clause violations subject to harmless error analysis) Therefore, we need not address whether those statements were admitted in violation of the Confrontation Clause of the Sixth Amendment.

*Corpus Delicti*

¶32　　　　Sabin next argues his conviction should be reversed because the state provided no proof of the *corpus delicti*, or body of the crime, independent of his confession. "The state 'must establish the *corpus delicti* by showing proof of a crime and that someone is

18

responsible for that crime.'" *State v. Morgan*, 204 Ariz. 166, ¶ 15, 61 P.3d 460, 464 (App. 2002), *quoting State v. Jones*, 198 Ariz. 18, ¶ 12, 6 P.3d 323, 327 (App. 2000). However, the state need only establish "a reasonable inference of the *corpus delicti* . . . before a confession may be considered: it need not be proven beyond a reasonable doubt." *State v. Gerlaugh*, 134 Ariz. 164, 170, 654 P.2d 800, 806 (1982). We review the trial court's ruling on the sufficiency of the evidence of *corpus delicti* for an abuse of discretion. *Morgan*, 204 Ariz. 166, ¶ 14, 61 P.3d at 464. Although a defendant may not be convicted of a crime based on an uncorroborated confession without independent proof of the *corpus delicti*, "a *corroborated* confession may be used." *Id*. ¶ 17 (emphasis added).

**¶33** Here, Sabin's confession was corroborated by K.'s statements to Ashley and Ron that she had been sexually abused by her father. Sabin contends that those statements were hearsay that "was decidedly not trustworthy," and therefore, insufficient to prove *corpus delicti*. However, the trial court assessed K.'s statements to Ashley and Ron under the residual hearsay exception, finding they were trustworthy. The record supports that finding. K.'s statements to both Ashley and Ron were consistent with each other. Nor has Sabin explained why K., Ashley, or Ron would fabricate such serious accusations against him.[10] To the contrary, those statements were consistent with his confession. Accordingly,

---

[10]Whether or not K.'s statements to Ashley and Ron were ultimately admitted in violation of Sabin's Sixth Amendment right to confront witnesses against him, the trial court could nonetheless consider those statements in assessing whether the state has demonstrated a *corpus delicti*. *See State v. Gerlaugh*, 134 Ariz. 164, 170, 654 P.2d 800, 806 (1982) (considering a codefendant's statement in determining *corpus delicti* although that statement

19

the trial court did not abuse its discretion in concluding that Sabin's confession was corroborated by reliable and independent evidence that the crime occurred. We find no error.

**Waiver of Trial**

¶34 Sabin argues that his waiver of his right to a jury trial was not knowing, voluntary, or intelligent. Although he acknowledges that he knowingly, voluntarily, and intelligently authorized the court to conduct a bench trial, he maintains that he did not knowingly, voluntarily, and intelligently agree to have the court conduct that trial on stipulated evidence alone—an event he characterizes as an effective waiver of his right to a trial altogether. Because Sabin did not object when counsel submitted his case to the trial court, we review the issue solely for fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, ¶ 19, 115 P.3d 601, 607 (2005).

¶35 Our supreme court has held that a trial court may not determine a defendant's guilt on stipulated evidence unless it informs the defendant of the rights he is waiving by agreeing to that process, specifically:

> 1. The right to a trial by jury where he may have representation of counsel;
>
> 2. The right to have the issue of guilt or innocence decided by the judge based solely upon the record submitted;
>
> 3. The right to testify in his own behalf;

"could not be considered by the jury to determine appellant's guilt").

20

4.     The right to be confronted with the witnesses against him;

5.     The right to compulsory process for obtaining witnesses in his favor;

6.     The right to know the range of sentence and special conditions of sentencing.

*State v. Avila*, 127 Ariz. 21, 24-25, 617 P.2d 1137, 1140-41 (1980).  And, any such waiver of those rights must be knowing, voluntary, and intelligent.  *Id*. at 25, 617 P.2d at 1141.

¶36     Here, the record demonstrates that Sabin knowingly, voluntarily, and intelligently agreed to submit the case to the trial court on stipulated evidence in lieu of a jury trial.  First, his counsel proposed the idea and itemized the evidence to be considered in Sabin's presence.  Next, still in the presence of Sabin, the court and counsel thoroughly discussed each piece of that evidence.  The trial court then placed Sabin under oath and ascertained from Sabin that he was clear-headed and not under the influence of any medications.  Thereafter, the court directed Sabin to review and sign a form that specified the rights he was foregoing by waiving his right to a jury trial.  Then, the court itself advised Sabin of the rights he would be giving up and the sentencing ranges he faced if the court found him guilty.  In response to the court's questions, Sabin confirmed that his decision to forego a jury trial was voluntary and intelligent.  Although the court did not focus on the distinction between a bench trial with live testimony and a bench trial on stipulated evidence at every step in the colloquy, the trial court made it clear to Sabin that the questions the

21

court was asking Sabin related to his waiver of the right to a jury trial in the context of the latter procedure.[11]

¶37 Because Sabin understood that he was waiving his right to a jury trial and that he was permitting the trial court to render a judgment based on stipulated evidence, and because the court thoroughly informed Sabin of each and every one of the jury trial rights he was thereby foregoing, the trial court did not err in concluding that Sabin knowingly, voluntarily, and intelligently agreed that it could determine his guilt based on stipulated evidence in lieu of a jury trial. We find no error, fundamental or otherwise.

### Amended Complaint

¶38 Sabin argues the trial court erred when it granted the state's motion to amend the indictment. The grand jury heard testimony that in his interview with detectives, in response to the question, "Did you have an orgasm inside her mouth?" Sabin had replied, "Yeah. . . . That happened twice." The grand jury indicted Sabin on nine counts of sexual misconduct, the last two of which were for sexual conduct with a minor "by ejaculating in the victim's mouth during oral sex." The state later dismissed counts two through seven of the charges, leaving only one count of continuous sexual abuse of a minor and the two

---

[11] THE COURT: I understand that you intend to waive your right to a jury and to submit this case for my decision based on the evidence that counsel discussed here in court, stipulated to provide me a list of; is that correct?

THE DEFENDANT: That's correct, Your Honor.

22

counts of oral sexual conduct with a minor. After the court had explained it was renumbering counts eight and nine as two and three, Sabin "put the Court and State on notice" that, "[d]epend[ing] pretty much on the way in which the evidence comes out in relation to counts . . . two, three," he might challenge those counts as duplicitous.

¶39 After Sabin mentioned the possible duplicity in the indictment, the state filed a motion to dismiss count three, which the court granted, and the state later moved to amend count two to add Sabin's own statements about the first time he had ejaculated in K.'s mouth during oral sex. The trial court granted the motion and we review its ruling for an abuse of discretion. *See State v. Johnson*, 198 Ariz. 245, ¶ 4, 8 P.3d 1159, 1161 (App. 2000).

¶40 Rule 13.5(b), Ariz. R. Crim. P., 17 A.R.S., allows a trial court to amend an indictment "only to correct mistakes of fact or remedy formal or technical defects." A defect is formal or technical when the amendment correcting it "'does not operate to change the nature of the offense charged or to prejudice the defendant in any way.'" *Johnson*, 198 Ariz. 245, ¶ 5, 8 P.3d at 1161, *quoting State v. Bruce*, 125 Ariz. 421, 423, 610 P.2d 55, 57 (1980). When making this determination, we consider whether the defendant has shown the amendment violated his right to notice of the charges against him or his right to be free from double jeopardy on the original charge. *Id.* ¶ 8. Sabin can hardly claim he did not have notice that his own words to the officers would be used to prove the charges of sexual conduct. *See State v. Whitney*, 159 Ariz. 476, 481, 768 P.2d 638, 643 (1989) (amendment

23

of information to include allegation of dangerousness though untimely did not prejudice defendant because he was aware of element from facts and prepared defense accordingly). And he only argues that "jeopardy could not have attached" to counts two and three before they were amended, not that the amendment of count two violated his right to be free from double jeopardy. *See Johnson*, 198 Ariz. 245, ¶ 8, 8 P.3d at 1162 (defendant must show indictment *as amended* violates his or her right to double jeopardy protection) (emphasis added).

**¶41**     Sabin claims he was prejudiced because he had "waived his right to a jury trial based on counsel's evaluation of the factual and legal issues which included the fact that Count Eight was duplicitous." But whether an indictment is duplicitous is a question of law for the trial court, not the jury. *See United States v. Martin*, 4 F.3d 757, 759 (9th Cir. 1993) (duplicity of indictment is question of law). And therefore, we fail to see how the issue was relevant to Sabin's decision to waive his right to a jury trial or how Sabin could have suffered prejudice as a result.

**¶42**     For the foregoing reasons, we affirm Sabin's conviction and sentence.

_____
PETER J. ECKERSTROM, Presiding Judge

CONCURRING:

_____
J. WILLIAM BRAMMER, JR., Judge


_____
PHILIP G. ESPINOSA, Judge